1

**BOIES SCHILLER FLEXNER LLP**
Brooke Alexander (pro hac vice pending)

2
balexander@bsfllp.com

3
333 Main Street
Armonk, NY 10504

4
Telephone:   (914) 749-8200
Facsimile:   (914) 749-8300

5

**BOIES SCHILLER FLEXNER LLP**

6
Mark C. Mao (SBN 236165)

7
mmao@bsfllp.com
44 Montgomery Street, 41st Floor

8
San Francisco, CA 94104
Telephone:   (415) 293-6800

9
Facsimile:   (415) 293-6899

10
Attorneys for Plaintiffs,

11
Edwin Garrison, Gregg Podalsky,
Skyler Lindeen, Alexander Chernyavsky,

12
Gary Piano, Sunil Kavuri, Gary Gallant
and David Nicol

13

14
                 **UNITED STATES DISTRICT COURT**

15
              **NORTHERN DISTRICT OF CALIFORNIA**

16
EDWIN GARRISON, GREGG PODALSKY,          **Case No. 3:23-cv-03628**

17
SKYLER LINDEEN, ALEXANDER
CHERNYAVSKY, GARY PIANO, SUNIL

18
KAVURI, GARY GALLANT and                 **CLASS ACTION COMPLAINT**
DAVID NICOL, on behalf of themselves and

19
all others similarly situated,

20
                 Plaintiffs,             **DEMAND FOR JURY TRIAL**

21
v.

22

23
GOLDEN STATE WARRIORS, LLC and
STEPHEN CURRY,

24
                 Defendants.

25

26

27

28

## CLASS ACTION COMPLAINT

Plaintiffs, on behalf of themselves and all others similarly situated, sue Defendants, who all promoted, assisted in, and/or actively participated in FTX Trading LTD d/b/a FTX's ("FTX Trading"), West Realm Shires Services Inc. d/b/a FTX US's ("FTX US"), and Alameda Research, LLC's (collectively, the "FTX Group" or "FTX"), offer and sale of unregistered securities, including but not limited to the Deceptive FTX Platform, identical FTX yield-bearing accounts ("YBAs") and FTX's native cryptocurrency token, "FTT," and also aided, abetted and/or actively participated in the FTX Group's massive, multibillion dollar global fraud.

## INTRODUCTION

1.      This Action is a Related Action to the multidistrict litigation *In re: FTX Cryptocurrency Exchange Collapse Litigation*, No. 1:23-md-3076 (S.D. Fla.) (the "FTX MDL"), pending in the United States District Court for the Southern District of Florida before the Honorable K. Michael Moore (the "Transferee Court"). A copy of the Transfer Order issued by the United States Judicial Panel on Multidistrict Litigation (the "Panel") in *In re: FTX Cryptocurrency Exchange Collapse Litigation*, MDL No. 3076, ECF No. 138 (J.P.M.L. June 5, 2023), is attached as **Exhibit A**. A Notice of Potential Tag-Along Action is being concurrently filed before the Panel in accordance with Rule 7.1(a) of the Panel's Rules of Procedure. This Related Action, which was originally filed in the Southern District of Florida, *Garrison, et al. v. Sam Bankman-Fried, et al.*, No. 1:22-cv-23753 (S.D. Fla.) is being filed again before this Court in this District in order to address the arguments Defendants Golden State Warriors, LLC and Stephen Curry raise regarding whether the Transferee Court has jurisdiction over them for these claims. The substantive allegations in both actions are the same, and will be amended in a consolidated amended class action complaint currently due to be filed August 7, 2023, once transferred to the Transferee Court and consolidated into the FTX MDL.

2.      Everyone now agrees the FTX Disaster is the largest financial fraud in US history. Sam Bankman-Fried, FTX's founder and former CEO, is on house arrest awaiting his criminal trial in October of this year. FTX's new CEO—who helped wind down Enron—concluded the

fraud here was worse than Enron. Billions of dollars have been stolen from investors across the globe. These Defendants conspired and aided and abetted FTX's multi-billion-dollar fraud and conversion for their own financial and professional gain.



3.      What's more, FTX would not have been successful in perpetrating this fraudulent scheme on Plaintiffs and Class Members around the globe without key events that took place in and emanated from Miami, Florida, which not only eventually became FTX's official headquarters but was their de facto domestic headquarters for years before FTX's eventual collapse. According to the Declaration of Dan Friedberg, attached as **Exhibit B**, FTX maintained an office in Miami,

Florida, since early 2021, long before FTX eventually moved its Domestic headquarters to Brickell in late 2022. *Id.*, ¶ 20. Since early 2021, FTX's Miami office was run by Mr. Avinash Dabir, who was based in Miami and originally worked for Blockfolio as Director of Product and Partnership before FTX later acquired Blockfolio in late 2020.[1] *Id.* Dabir eventually became FTX's Vice President of Business Development. *Id.* Friedberg met with Mr. Dabir often and is very familiar with Mr. Dabir and his activities. *Id.*

4.    Mr. Dabir operated from FTX's Miami office, and he was focused on formulating and executing FTX's important celebrity partnerships. *Id.*, ¶ 21. Mr. Dabir had a lot of prior experience working with some of the major sports industries, including the NBA. *Id.*

5.    According to Friedberg, Mr. Dabir was very good at his job, and it was his idea to expend significant resources on FTX's sports and celebrity-based partnerships. *Id.*, ¶ 22. Mr. Dabir specifically started by suggesting FTX form a Partnership with the Miami Heat and the naming rights to the Miami Arena. *Id.* FTX announced the Partnership in March 2021, and included FTX purchasing the naming rights of the Miami Heat stadium for 19 years in a deal worth approximately $135 million. *Id.*

6.    The naming of the "FTX Arena" served as an important centerpiece for FTX's efforts to reach other FTX partnerships with celebrities and other well-known partners. *Id.*, ¶ 23. Mr. Dabir was the senior FTX executive responsible for creating, consummating, and implementing deals between FTX and other Partners, such as Major League Baseball, the MLB Umpire's Association, TSM, the Mercedes Formula 1 team, Tom Brady, Stephen Curry, the Golden State Warriors, Naomi Osaka, Larry David, and Shohei Ohtani. *Id.*

7.    Having Larry David agree to conduct a commercial for FTX during the 2022 Super Bowl was a very big event for FTX because, according to Friedberg, it was the first time that he

---

[1]    *See*   https://www.coindesk.com/markets/2020/08/25/ftx-exchanges-150m-deal-for-mobile-first-blockfolio-is-a-retail-trading-play/   (accessed   May   10,   2023);   *see also* https://www.crunchbase.com/organization/blockfolio/people (accessed May 10, 2023).

had ever agreed to serve as a spokesperson for any product. *Id.*, ¶ 24. Mr. Dabir deserves much of the credit for creating that idea and concept and collaborating with Mr. David and his team, resulting in the award-winning Super Bowl FTX commercial that aired with the Super Bowl in 2022. *Id.*

8.      Released on March 31, 2022, Mr. Dabir appeared on the popular cryptocurrency podcast *The Joe Pomp Show*, where he was interviewed by Mr. Pompliano for over half an hour on specifically the efforts he undertook and oversaw from his FTX base of operations in Miami, Florida, to create, consummate, and implement, among other things, the FTX arena deal and the Larry David Superbowl commercial. A transcript of the podcast is attached as **Exhibit C**.

9.      Mr. Dabir begins by introducing himself as "Vice President of Business Development at FTX, so I handle a lot of our sports partnerships as well as doing some of the interesting things in real estate as well." Ex. C at 2. He then explains that "the end goal" is really how does FTX "acquire more users." *Id.*

10.     After first acknowledging and agreeing with Mr. Pompliano that FTX was at that point the "leaders" in the sports partnership category and that "it started with Miami Heat Arena," Mr. Dabir explained that he led the effort to obtain the FTX Arena deal because he "had previously worked at the NBA" and that he identified Miami because it had "a great market," a "multicultural, great team," and the "Crypto Buzz was like growing here in Miami." *Id.*, at 2–3. Dabir explained that a contributing factor to the deal was "the fact that this was during COVID where, you know, a decent amount of live event businesses were-were short on revenue," which "opened up the door where we could have that conversation" with Miami-Dade County and the Miami Heat. *Id.*, at 4.

11.     Mr. Dabir also explained that it was crucial "to get approval from a local government, plus the Heat and the NBA who had their own diligence teams looking into" the FTX Arena deal because it "really sort of validated not only just FTX but the cryptocurrency industry in general." *Id.*, at 4.

12.     In order to close the FTX Arena deal, according to Mr. Dabir, FTX confidentially disclosed to Miami-Dade County and the Miami Heat FTX's balance sheet—which was comprised

almost entirely of customer funds—and he explained to Mr. Pompliano that "there are ways to structure these deals in a way where, you know, you can front load some of the funds, right, to-to provide some more comfort." *Id.*

13.     Mr. Dabir explained that there were multiple ways that FTX measured the success of their Brand Ambassador program, with the "obvious one [being] straight up conversion," as in "[h]ow many people in Florida download the app or around the Miami area, download the app, register, deposit, trade, you know, it's that standard sort of funnel that's very easy to track." *Id.*, at 6. But the other method, according to Mr. Dabir, is the "intangible element" of "trust" and "legitimacy" that comes from "building trust and value through brand association," like "I've already heard of FTX because of FTX Arena, or I saw your Super Bowl spot with-with Larry David." *Id.*

14.     Mr. Dabir also explains how he oversaw and participated in the creation of Larry David's now infamous 2022 Super Bowl ad, and recounting, "when we saw the script, we were like, this script is awesome. And then-then we're like, 'We have to get Larry David, right?' And then, you know, the teams went to work to try, and I don't know if that commercial works, if it's not Larry David, right?" *Id.*, 7.

15.     Crucially, all FTX employees or agents who were involved in the Larry David Super Bowl commercial ultimately reported to Avi Dabir, who had final approval of all aspects of the commercial from his base of operations in Miami.

16.     FTX will be involved in federal bankruptcy proceedings for many years and there is no guarantee that <u>any of the victims</u> will be able to see <u>any recovery</u> from those proceedings. This Federal Consolidated Action may be the only avenue for any of the victims to recover any of their damages. This action is specifically brought against persons and celebrities who were specifically warned by the SEC back in 2017 (and in many FTC Guidelines), that if they promote cryptocurrency products like the Deceptive FTX Platform, YBAs, or FTT, and those products are found to be "securities," those people may be liable under state and/or federal regulations for: (1)

promoting an unregistered security, or (2) failing to properly disclose their payments and compensation. Those specific claims have a strict liability standard with no *caveat emptor* defense.

17. The question of whether the promotion of the Deceptive FTX Platform, the sale of every YBA and/or FTT is (or is not) the sale of "unregistered securities" has practically been answered in the affirmative through various regulatory statements, guidance, and actions issued by the Securities and Exchange Commission and other regulatory entities. For example, on November 1, 2017, in the "SEC Statement Urging Caution Around Celebrity Backed ICOs,"[2]

> In the SEC's Report of Investigation concerning The DAO,[3] the Commission warned that virtual tokens or coins sold in ICOs may be securities, and those who offer and sell securities in the United States must comply with the federal securities laws. Any celebrity or other individual who promotes a virtual token or coin that is a security must disclose the nature, scope, and amount of compensation received in exchange for the promotion. A failure to disclose this information is a violation of the anti-touting provisions of the federal securities laws. **Persons making these endorsements may also be liable** for potential violations of the anti-fraud provisions of the federal securities laws, **for participating in an unregistered offer and sale of securities**, and for acting as unregistered brokers. The SEC will continue to focus on these types of promotions to protect investors and to ensure compliance with the securities laws.

18. The SEC and state securities regulators over the past 5 years, have already found liable numerous celebrities, cryptocurrency brokers and exchanges just like FTX for offering this exact same type of interest-bearing account and native token, finding that exchanges such as BlockFi,[4] Voyager,[5] and Celsius[6] all offered these same products as unregistered securities.

---

[2] https://www.sec.gov/news/public-statement/statement-potentially-unlawful-promotion-icos (accessed May 11, 2023).

[3] https://www.sec.gov/litigation/investreport/34-81207.pdf (accessed May 11, 2023).

[4] https://www.sec.gov/news/press-release/2022-26 (accessed May 11, 2023).

[5] https://coingeek.com/6-us-regulators-crackdown-on-voyager-digital-over-interest-bearing-accounts/ (accessed May 11, 2023).

[6] https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&cad=rja&uact=8&ved=2ahUKEwjvjNvg27j7AhWfRTABHfwzDe4QFnoECAsQAQ&url=https%3A%2F%2Fwww.nj.gov%2Foag%2Fnewsreleases21%2FCelsius-Order-9.17.21.pdf&usg=AOvVaw0Zd94fuhFSsOoGKM-vQ3YI (accessed May 11, 2023).

19.     A second narrow issue that is common to the entire Proposed Class, whose focus is also solely objective, is whether these Defendants violated state consumer laws by failing to abide by any of the FTC's long-established rules and regulations, specifically on what is required for a celebrity endorsement of cryptocurrency.

20.     We all need to be clear. This is <u>not</u> a case where Plaintiffs made a "risky" investment in stock or cryptocurrency, or that they lost money speculating on various cryptocurrency projects. Plaintiffs' claims arise simply from the purchase of and investment in the Deceptive FTX Platform, FTT, and/or a YBA, a savings type of account with FTX that every customer who signed up for the FTX app received by default, and which, as explained below, was guaranteed to generate returns on their significant holdings in the accounts, regardless of whether those assets were held as USD, legal tender or cryptocurrency, and regardless of whether any trades were made with the assets held on the Deceptive FTX Platform or in the YBA. In other words, the Deceptive FTX Platform and YBAs were portrayed to be like a bank account, something that was "very safe" and "protected." That is the narrative that Defendants pushed in promoting the Deceptive FTX Platform and the offer and sale of YBAs and/or FTT, all of which are unregistered securities. For that, Defendants are liable for Plaintiffs' losses, jointly and severally and to the same extent as if they were themselves the FTX Group.

21.     Literally overnight, Plaintiffs' assets, including FTT,[7] held on the Deceptive FTX Platform and/or in their YBAs were robbed from them as FTX imploded and former-CEO, Sam

---

[7] Although the FTX Group purported to maintain a separation between the US and International platform—in large part because it knew its products offered on the international exchange were securities required to be registered with securities regulators—the separation was merely a farce and was easily circumvented (which was something that the FTX Group encouraged) through the use of, for instance, a VPN. *See* https://blockduo.com/ftx-usa/ ("FTX, like other crypto exchanges, uses something called geo-blocking to stop users from restricted countries from using the exchange. They do this by seeing where your IP address is, and if it is from one of the banned countries, they will block you from the site. With the now wide availability of VPNs, this can be bypassed") (accessed May 11, 2023). The use of VPNs to circumvent geo-blocking for cryptocurrency exchanges is a well-known and widely used method encouraged by

Bankman-Fried, filed a Chapter 11 bankruptcy petition in Delaware on an emergency basis. This happened because, as explained by the new CEO of the failed FTX Group:

> I have over 40 years of legal and restructuring experience. I have been the Chief Restructuring Officer or Chief Executive Officer in several of the largest corporate failures in history. I have supervised situations involving allegations of criminal activity and malfeasance (Enron). I have supervised situations involving novel financial structures (Enron and Residential Capital) and cross-border asset recovery and maximization (Nortel and Overseas Shipholding). Nearly every situation in which I have been involved has been characterized by defects of some sort in internal controls, regulatory compliance, human resources and systems integrity.
>
> ***Never*** in my career have I seen such a complete failure of corporate controls and such a **complete absence of trustworthy financial information** as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced, **unsophisticated** and **potentially compromised** individuals, **this situation is unprecedented**.

*See In re: FTX Trading Ltd, et al.*, No. 22-11068 (JTD), ECF No. 24, ¶¶ 4–5 (D. Del. Nov. 17, 2022) (emphasis added).

22.    The Cryptocurrency National Disaster is growing by the billions almost every day. More crypto companies are filing new federal bankruptcy petitions each day, all running for protection from the billions of dollars of losses they directly caused to thousands of investors here in Florida and across the globe. This is by far the largest securities national disaster, greatly surpassing the Madoff Ponzi Scheme, and could very likely become a complex international litigation disaster, similar to how the hundreds of thousands of asbestos cases swamped all courts

---

the exchanges to rake in as many new U.S.-based customers as possible to keep new funds loading onto their platform. *See CFTC v. Changpeng Zhao, et al.,* No. 1:23-cv-01887, ECF No. 1 (N.D. Ill. Mar. 27, 2023) (CFTC enforcement action brought because "Binance and its officers, employees, and agents have instructed U.S. customers to use virtual private networks ('VPNs') to obscure their location; allowed customers that had not submitted proof of their identity and location to continue to trade on the platform long after announcing such conduct was prohibited; and directed VIP customers with ultimate beneficial owners, key employees who control trading decisions, trading algorithms, and other assets all located in the United States to open Binance accounts under the name of newly incorporated shell companies to evade Binance's compliance controls.").

across the globe. Unless a workable, coordinated, and organized structure is established now, at the very onset of these proceedings, here in Miami, which served as the epicenter for the crypto fraud, the FTX victims will continue to suffer and the only people to benefit will be the professionals in the bankruptcy and civil courts.

23.    The Deceptive and failed FTX Platform all emanated from here in Miami, Florida, FTX's domestic headquarters and the host of the largest and most famous International World Cryptocurrency Conventions. FTX's fraudulent scheme was designed to take advantage of unsophisticated investors from across the globe, who utilize mobile apps to make their investments. As a result, consumers around the globe collectively sustained billions of dollars in damages. FTX organized and emanated its fraudulent plan from its worldwide headquarters located here in Miami, Florida. Miami became the "hot spot" for crypto companies, hosting the most investments in crypto startups as well as the annual Bitcoin Miami 2022 Global Forum. Several crypto companies, including crypto exchange Blockchain.com, Ripple and FTX.US, moved their headquarters to Miami. Others, including fellow exchange eToro, expanded their U.S. presence with offices in Miami. FTX was already very familiar with Miami, signing a deal worth more than $135 million dollars for the naming rights of the waterfront arena, where 3-time NBA Champions the Miami Heat play.

**FACTUAL BACKGROUND**

24.    Undersigned Counsel have been investigating and litigating these specific issues for over a year before this Court. On December 24, 2021, counsel for Plaintiffs and the proposed class members brought the first (and only) putative nationwide class action complaint against the now-defunct cryptocurrency trading app, Voyager, styled *Mark Cassidy v. Voyager Digital Ltd., et al.,* Case No. 21-24441-CIV-ALTONAGA/Torres (the "*Cassidy* Action"), alleging that the platform owned and operated by Voyager Digital Ltd. ("Voyager") and Voyager Digital LLC ("VDL") was an unregulated and unsustainable fraud. In the *Cassidy* Action, plaintiffs also alleged that Defendant Ehrlich, Voyager's CEO, teamed up with Defendants Cuban and the Dallas Mavericks to promote Voyager, by making false representations and employing other means of

deception. As a result, the Voyager plaintiffs and Voyager class members all sustained losses in excess of $5 billion.

25.   The allegations in the *Cassidy* complaint—and specifically Mark Cuban's role in promoting Voyager—received national attention. *See* https://www.jdsupra.com/legalnews/new-lawsuits-target-cryptocurrency-9604406/ (summarizing the allegations and explaining that "Mark Cuban, owner of the NBA's Dallas Mavericks, is a major stakeholder in Voyager. The complaint alleges that he made comments at a press conference in which he specifically targeted unsophisticated investors 'with false and misleading promises of reaping large profits in the cryptocurrency market.'"); https://www.law.com/dailybusinessreview/2021/12/29/mark-cuban-linked-crypto-platform-hit-with-florida-nationwide-class-action-lawsuit-in-miami-federal-court/?slreturn=20220701214901 (same, in the *Daily Business Review*).

26.   After the Cassidy Complaint was filed, the following important actions took place:

(a)   the United States Securities and Exchange Commission (SEC) began an enforcement review focused on whether Voyager's Earn Program Accounts ("EPAs") constitute unregistered securities;

(b)   seven state Attorneys General (New Jersey, Alabama, Kentucky, Oklahoma, Texas, Vermont and Washington) took specific action finding that Voyager was violating their state laws, including issuing "cease and desist" letters to Voyager, finding that the EPA was an unregistered security, prohibiting the crypto-asset broker-dealer from selling any more unregistered securities (finding that Voyager used these EPAs to raise millions of dollars in revenue worldwide as of March 1, 2022; and

(c)   on March 29, 2002, the State of New Jersey Bureau of Securities entered a Cease and Desist Order against Voyager, finding that the EPA was not exempt from registration under the law, and instead that it must be registered—and as a result, Voyager's stock price tanked by 25% in a day and is down over 80% for the year.[8]

---

[8]   https://seekingalpha.com/article/4498956-voyager-digital-plunged-25-percent-heres-why (accessed October 28, 2022); https://seekingalpha.com/article/4503716-voyager-digital-buy-dip-during-crypto-crash (accessed May 11, 2023).

27.     On July 5, 2022, Voyager Digital Holdings, Inc. and two affiliated debtors (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code. Voyager's bankruptcy cases (the "Voyager Bankruptcy Cases") are jointly administered under Case No. 22-10943 before the Honorable Michael E. Wiles in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

28.     On September 28, 2022, Voyager filed a motion in the Voyager Bankruptcy Cases seeking authority to enter into an asset purchase agreement with West Realm Shires Inc., d/b/a FTX US whereby Voyager will sell substantially all of its assets for a purchase price of approximately $1.422 billion, which includes (i) the value of cryptocurrency on the Voyager platform as of a date to be determined, which, as of September 26, 2022, is estimated to be $1.311 billion, plus (ii) additional consideration which is estimated to provide at least approximately $111 million of incremental value to the Debtors' estates.

29.     Everyone involved in the Voyager Bankruptcy Cases thought that the FTX Group were the *deus ex machina* come to save the day by bailing out Voyager and paying back at least some of the losses the Voyager customers sustained.

30.     Instead, as explained below, the FTX Group imploded, their over $30 billion in value evaporated almost overnight, and the FTX Group found themselves filing their own emergency Chapter 11 bankruptcy petition in Delaware. The Deceptive FTX Platform maintained by the FTX Group was truly a house of cards, a Ponzi scheme where the FTX Group shuffled customer funds between their opaque affiliated entities, using new investor funds obtained through investments in the Deceptive FTX Platform, the YBAs, FTT, and/or loans to pay interest and investment withdrawals to the old ones and to attempt to maintain the appearance of liquidity.

31.     Part of the scheme employed by the FTX Group involved utilizing some of the biggest names in sports and entertainment to raise funds and drive global consumers to invest in the Deceptive FTX Platform, the YBAs, and/or FTT, which were offered and sold largely from the FTX Group's domestic base of operations here in Miami, Florida, pouring billions of dollars into the Deceptive FTX Platform to keep the whole scheme afloat.

CLASS ACTION COMPLAINT

32.     Importantly, although Defendants disclosed their partnerships with the FTX Group, they have never disclosed the nature, scope, and amount of compensation they personally received in exchange for the promotion of the Deceptive FTX Platform, which the SEC has explained that a failure to disclose this information would be a violation of the anti-touting provisions of the federal securities laws.[9]

33.     Moreover, as explained in detail below, there were clear red flags that sophisticated investors like the FTX Brand Ambassador Defendants would be able to identify while doing any modicum of due diligence to either ask follow-up questions or decline the opportunity to conduct further business together.

34.     The fact that the FTX Brand Ambassadors jumped at the opportunity to work with the FTX Group—and be paid millions, tens of millions, or even hundreds of millions in cash, equity stakes, and/or cryptocurrency to do so—is strong circumstantial evidence that these FTX Brand Ambassador Defendants had actual knowledge that the FTX Group was a fraudulent Ponzi scheme that was converting its customers' funds for its own use. Yet, they still participated in the FTX Group's scheme, and proximately caused the damages to the Plaintiffs and the Class.

35.     The SEC took action against boxing champ Floyd Mayweather and music producer DJ Khaled after they were paid by cryptocurrency issuers to tweet promotional statements about investing in Initial Coin Offerings (ICOs), ordering them both to pay disgorgement, penalties and interest for promoting investments in ICOs, including one from cryptocurrency issuer Centra Tech, Inc., for a combined total of $767,500 because they failed to disclose that their promotional efforts on Twitter were paid endorsements.[10]

---

[9]     https://www.ubergizmo.com/2017/11/sec-celebrities-disclose-payment-cryptocurrency-endorsements/#:~:text=It%20has%20issued%20a%20statement%20warning%20celebrities%20that,without%20disclosing%20that%20they%E2%80%99ve%20been%20paid%20for%20it (accessed May 11, 2023).

[10]     https://news.bloomberglaw.com/us-law-week/insights-celebrity-endorsements-and-cryptocurrency-a-cautionary-tale (accessed May 11, 2023).

36.     Other celebrities similarly accused and prosecuted for failing to disclose their paid endorsements include Kim Kardashian and basketball player Paul Pierce.[11] According to the Federal Trade Commission, cryptocurrency scams have increased more than ten-fold year-over-year with consumers losing more than $80 million since October 2020, due in large part to the use of such celebrity endorsements. [12]

37.     As explained more fully in this Complaint, Defendants' misrepresentations and omissions made and broadcast around the globe through the television and internet render them liable to Plaintiff and class members for soliciting and/or personally participating in their purchases of the unregistered Deceptive FTX Platform, YBAs, and/or FTT. *Wildes v. Bitconnect Int'l PLC*, No. 20-11675 (11th Cir. Feb. 18, 2022) (holding that promoters of cryptocurrency through online videos could be liable for soliciting the purchase of unregistered securities through mass communication, and no "personal solicitation" was necessary for solicitation to be actionable).

38.     This action seeks to hold Defendants responsible for the many billions of dollars in damages they caused Plaintiffs and the Class and to force Defendants to make them whole.

## PARTIES

39.     Each Plaintiff is among the class of individuals the FTX Brand Ambassador Defendants, through their paid promotions on behalf of FTX, influenced or attempted to influence to invest in FTX crypto-related securities, and each Plaintiff made such investments after being exposed to some or all of the FTX Brand Ambassador Defendants' promotional activities described in this Complaint. In addition, each Plaintiff was harmed by the conduct of the FTX Insiders, including their promotion and maintenance of the Deceptive FTX Platform, their

---

[11]   https://blockbulletin.com/news/altcoins/kim-kardashian-among-other-celebrities-sued-for-promoting-cryptocurrencies/ (accessed May 11, 2023).

[12]   https://florida.foolproofme.org/articles/770-celebrity-cryptocurrency-scam   (accessed May 11, 2023).

CLASS ACTION COMPLAINT

1  participation in FTX's offering or sale of unregistered securities, and their misrepresentations and

2  omissions regarding the FTX Platform.

3        40.    **Plaintiff Edwin Garrison** is a citizen and resident of the State of Oklahoma. He is

4  a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Garrison purchased,

5  repurchased, invested, reinvested, deposited and/or transferred additional funds or

6  cryptocurrencies on the Deceptive FTX Platform and/or his YBA and/or purchased, repurchased,

7  invested, and/or reinvested in FTT Tokens after being exposed to some or all of Defendants'

8  misrepresentations and omissions regarding the Deceptive FTX Platform as detailed in this

9  complaint, and executed trades on the Deceptive FTX Platform after those misrepresentations and

10  omissions were made and in reliance on those misrepresentations and omissions. As a result,

11  Plaintiff Garrison has sustained damages for which Defendants are liable.

12        41.    **Plaintiff Gregg Podalsky** is a citizen and resident of Florida. He is a natural person

13  over the age of 21 and is otherwise *sui juris*. Plaintiff Podalsky purchased, repurchased, invested,

14  reinvested, deposited and/or transferred additional funds or cryptocurrencies on the Deceptive

15  FTX Platform and/or his YBA and/or purchased, repurchased, invested, and/or reinvested in FTT

16  Tokens after being exposed to some or all of Defendants' misrepresentations and omissions

17  regarding the Deceptive FTX Platform as detailed in this complaint, and executed trades on the

18  Deceptive FTX Platform after those misrepresentations and omissions were made and in reliance

19  on those misrepresentations and omissions. As a result, Plaintiff Podalsky has sustained damages

20  for which Defendants are liable.

21        42.    **Plaintiff Skyler Lindeen** is a citizen and resident of Florida. He is a natural person

22  over the age of 21 and is otherwise *sui juris*. Plaintiff Lindeen purchased, repurchased, invested,

23  reinvested, deposited and/or transferred additional funds or cryptocurrencies on the Deceptive

24  FTX Platform and/or his YBA and/or purchased, repurchased, invested, and/or reinvested in FTT

25  Tokens after being exposed to some or all of Defendants' misrepresentations and omissions

26  regarding the Deceptive FTX Platform as detailed in this complaint, and executed trades on the

27  Deceptive FTX Platform after those misrepresentations and omissions were made and in reliance

28

on those misrepresentations and omissions. As a result, Plaintiff Lindeen has sustained damages for which Defendants are liable.

43. **Plaintiff Alexander Chernyavsky** is a citizen and resident of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Chernyavsky purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds or cryptocurrencies on the Deceptive FTX Platform and/or his YBA and/or purchased, repurchased, invested, and/or reinvested in FTT Tokens after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as detailed in this complaint, and executed trades on the Deceptive FTX Platform after those misrepresentations and omissions were made and in reliance on those misrepresentations and omissions. As a result, Plaintiff Chernyavsky has sustained damages for which Defendants are liable.

44. **Plaintiff Gary Piano** is a citizen and resident of California. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Piano purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds or cryptocurrencies on the Deceptive FTX Platform and/or his YBA and/or purchased, repurchased, invested, and/or reinvested in FTT Tokens after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as detailed in this complaint, and executed trades on the Deceptive FTX Platform after those misrepresentations and omissions were made and in reliance on those misrepresentations and omissions. As a result, Plaintiff Piano has sustained damages for which Defendants are liable.

45. **Plaintiff Sunil Kavuri** is a citizen and resident of the United Kingdom. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Kavuri purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds or cryptocurrencies on the Deceptive FTX Platform and/or his YBA and/or purchased, repurchased, invested, and/or reinvested in FTT Tokens after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as detailed in this complaint, and executed trades on the Deceptive FTX Platform after those misrepresentations and

CLASS ACTION COMPLAINT

omissions were made and in reliance on those misrepresentations and omissions. As a result, Plaintiff Kavuri has sustained damages for which Defendants are liable.

46.   **Plaintiff Gary Gallant** is a citizen and resident of Canada. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Gallant purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds or cryptocurrencies on the Deceptive FTX Platform and/or his YBA and/or purchased, repurchased, invested, and/or reinvested in FTT Tokens after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as detailed in this complaint, and executed trades on the Deceptive FTX Platform after those misrepresentations and omissions were made and in reliance on those misrepresentations and omissions. As a result, Plaintiff Gallant has sustained damages for which Defendants are liable.

47.   **Plaintiff David Nicol** is a citizen and resident of Sydney, Australia. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Nicol purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds or cryptocurrencies on the Deceptive FTX Platform and/or his YBA and/or purchased, repurchased, invested, and/or reinvested in FTT Tokens after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as detailed in this complaint, and executed trades on the Deceptive FTX Platform after those misrepresentations and omissions were made and in reliance on those misrepresentations and omissions. As a result, Plaintiff Nicol has sustained damages for which Defendants are liable.

48.   **FTX Brand Ambassador Defendants** are all persons and/or companies, that: (1) agreed to serve as "Brand Ambassadors" for FTX, (2) all admittedly advertised and promoted the sale of the Deceptive FTX Platform, YBAs and/or FTT and (3) none of them disclosed, in any of their marketing campaigns and/or advertisements, that they were paid millions of dollars by FTX and profited from the sale of cryptocurrency, Deceptive FTX Platform, YBAs and/or FTT , in clear violation of SEC, FTC and various federal and state regulations.

49.    **Defendant Stephen Curry,** professional basketball player for the Golden State Warriors of the NBA and brand ambassador for FTX, is a citizen and resident of the State of California.

50.    **Defendant Golden State Warriors LLC** is a professional basketball team in the NBA that officially launched their partnership with FTX in 2022 with the unveiling of the FTX logo on the court at the Chase Center, and is a corporation operating and existing under the laws of the State of California.

## JURISDICTION AND VENUE

51.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action for a sum exceeding $1,000,000,000.00 (one billion dollars), exclusive of interest and costs, and in which at least one class member is a citizen of a state different than the Defendants.

52.    This Court has general personal jurisdiction over Defendants Stephen Curry and Golden State Warriors LLC because Defendant Stephen Curry is domiciled in this state and Defendant Golden State Warriors LLC's principal place of business is in this District, and Defendants Stephen Curry and the Golden State Warriors are engaged in substantial and not isolated activity within this state, rendering Defendants Stephen Curry and Golden State Warriors subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity. Upon transfer of this Related Action to the Transferee Court for consolidation into the FTX MDL, the Transferee Court will have personal jurisdiction over Defendants Stephen Curry and Golden State Warriors because in enacting the multidistrict litigation statute, 28 U.S.C. § 1407, Congress "authoriz[ed] the federal courts to exercise nationwide personal jurisdiction …. And [t]ransfers under Section 1407 are simply not encumbered by considerations of in personam jurisdiction …." *In re Agent orange Prod. Liab. Litig. MDL No. 381*, 818 F.2d 145, 163 (2d Cir. 1987). The Transferee Court further independently has personal jurisdiction over Defendants because the Court has jurisdiction over one or more of the co-conspirators of the civil conspiracy alleged herein, and because Defendants regularly conducted business in Florida and/or engaged in

1  continuous and systematic activities within Florida, and committed tortious acts in the state of

2  Florida, including aiding and abetting the fraud, and the other tortious acts, as alleged herein.

3      53.    Venue is proper in this District pursuant to 28 U.S.C. § 1391, because Defendants

4  Stephen Curry and Golden State Warriors, LLC reside in this District. Venue is also proper in the

5  Southern District of Florida before the Transferee Court pursuant to 28 U.S.C. § 1407, because the

6  Panel ordered in its Transfer order that all Related Actions be transferred to the Transferee Court

7  and consolidated into the FTX MDL for pretrial purposes. Venue is further proper in the Southern

8  District of Florida before the Transferee Court pursuant to 28 U.S.C. § 1391 because the acts,

9  practices, and courses of business constituting the violations alleged in this Complaint occurred

10  within this District.

11      54.    All conditions precedent to the institution and maintenance of this action have been

12  performed, excused, waived, or have otherwise occurred.

13      55.    Divisional assignment to the San Francisco and Oakland Division of the Northern

14  District of California is appropriate pursuant to Civil L.R. 3-2(c) because a substantial part of the

15  events or omissions giving rise to the claims at issue occurred in Berkeley, California. Alameda

16  Research, the cryptocurrency trading fund at the heart of this case, was founded in Berkeley. In

17  addition, FTX US customers—including the named Plaintiff here—were instructed to and did

18  deposit funds in FTX US accounts by submitting wire transfers to West Realm Shires Services,

19  Inc., with its payee address at 2000 Center Street, Berkeley, California, 94704. On information

20  and belief, customers directed at least tens of millions of dollars to the Defendants' Berkeley

21  address.

22                          **FACTUAL ALLEGATIONS**

23  **A.    Background on FTX and its Key Players.**

24      56.    Until seeking the protection of the Bankruptcy Court, the FTX Group operated a

25  multi-billion-dollar mobile application cryptocurrency investment service (the "Deceptive FTX

26  Platform") that placed cryptocurrency trade orders on behalf of users like Plaintiff and Class

27  Members and offered interest bearing cryptocurrency accounts.

28

57.     Attached as **Exhibit D** is the Expert Report of Paul Sibenik, Lead Case Manager at CipherBlade Blockchain Investigation Agency, which is incorporated into this complaint in its entirety by reference, and additionally as cited.

58.     As Sibenik explains, in many ways, centralized cryptocurrency exchanges, including FTX, are analogous to banks albeit for the cryptocurrency industry. Ex. D ¶ 10.

59.     More specifically, cryptocurrency exchanges accept deposits of cryptocurrency, and often fiat currency on behalf of their customers. Ex. D ¶ 11. Once that cryptocurrency is received by the exchange then it has dominion and control over those assets. *Id.*

60.     The exchange then credits the applicable customer account with the appropriate amount of cryptocurrency or fiat assets the exchange received. Ex. D ¶ 12. This credit can be regarded as a liability of the exchange to its customer. *Id.*

61.     If, for example, cryptocurrency was deposited to the customer's exchange account, the customer could then take that credit received from the exchange, and:

a)  Trade it for another cryptocurrency

b)  Trade it for fiat currency

c)  Leave it as a balance on the exchange account (leaving an open liability of the exchange to the customer)

d)  Withdraw it (withdrawal could be done prior to or after a trade or conversion)

These things could be done in whole or in part. Ledger entries would (and should) be made internally by the exchange to account for changes in positions and applicable balances. Ex. D ¶ 13.

62.     The exchange accounts should very much be regarded as being custodial in nature. Ex. D ¶ 14. This means that the customer does not *control* access to the assets 'in' their account. *Id.* The customer needs to make a request to the exchange to be able to access and send those balances. *Id.* The exchange then debits the user account and sends the assets. *Id.* Whether or not

such requests are processed are dependent on the willingness, ability, and approval of the exchange. *Id.*

63.     One major factor the affects the exchange's ability to process such requests is whether or not they have the assets and/or capital necessary to do so. Ex. D ¶ 15.

64.     For any non-yield-bearing account, this *shouldn't* be a problem, since exchanges *should* have enough assets in custody for the benefit of their customers to cover their liabilities to their customers, and on a 1:1 basis. Ex. D ¶ 16. FTX's terms of service seems to guarantee this, although FTX clearly violated their own terms of service:

> *"Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account."*

> *"None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading."*

> *"You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party."*[13]

*Id.*

65.     While FTX violated their own terms of service, it would also have been true that some of these claims would have been demonstrably false to begin with even if there was hypothetically no wrongdoing on the part of FTX. Ex D ¶ 17. This is because FTX exchange accounts (or any exchange account with any centralized custodial exchange, including Coinbase for example) are custodial in nature. *Id.* This means that the customer does not control access to the assets 'in' their account. The customer needs to make a request to the exchange to be able to access and send those balances. It is very much the exchange that controls the assets, not their

---

[13]     https://help.ftx.com/hc/article_attachments/9719619779348/FTX_Terms_of_Service.pdf (accessed May 11, 2023).

customer. *Id.* However, it should also be noted that the digital assets aren't technically 'in' the account at all. *Id.* At a technical level, an exchange account cannot hold or store cryptocurrency. *Id.* The account stores a record of a liability or an IOU to the exchange's customer. *Id.* When a user purchases cryptocurrency on an exchange, they aren't technically purchasing that cryptocurrency; they are purchasing an IOU for that cryptocurrency. *Id.* Because this concept of buying and storage can be difficult to understand, it's somewhat common for newcomers to associate such IOUs as being the same as storing cryptocurrency assets 'on' their account, even though it's not technically true. *Id.*

66.     With any yield-bearing account, it could generally be expected for an exchange to take those customers and leverage, loan or invest them in some way, and hopefully receive enough assets back to be able to pay out their customers back their principal, in addition to yield or interest earned, when applicable customers attempt to redeem or withdraw those funds. Ex. D ¶ 18.

67.     While the existence of such loans associated with assets deposited to yield-bearing accounts was known, the substantial risks associated with such loans, and by extension the yield-bearing accounts in general was not adequately represented, for reasons I will demonstrate later in this report. Ex. D ¶ 19.

68.     The main functional differences between banks and cryptocurrency exchanges is such that exchanges are largely unregulated, and that exchanges (and by extension exchange accounts and the users who use them) are subject to a lot of additional risks compared to that of a bank account. Ex. D ¶ 20.

69.     Banks are, of course, subject to a variety of capital control requirements to ensure protection of consumer assets. Banks are regulated with regards to the type of assets that they can investment customer assets in. Ex. D ¶ 21. Banks are subject to regular financial audits. Banks have regulatory oversight to ensure the protection of consumer assets. And of course, bank accounts have FDIC insurance so that bank account holders have coverage in case a bank, despite such measures, becomes insolvent. *Id.*

70.    Exchanges, on the other hand, are not subject to capital control requirements. Ex. D ¶ 22. While almost all exchanges will indicate that they 'securely' store all customer assets 1:1 in 'cold storage,' there is no regulatory requirement in most jurisdictions (including the US) for exchanges to do so, nor is there any requirement for exchanges to offer any transparency regarding their solvency or use of customer assets to regulators or to the general public. *Id.*

71.    Other than by an exchange's own terms of service (which wasn't adhered to in this case), exchanges are not prevented from whether they invest customer assets elsewhere, and if so, what types of investments they enter into, or loans they provide, regardless of the inherent level of risk. Ex. D ¶ 23. And exchanges have no requirement to have any type of insurance equivalent to FDIC insurance. *Id.* While some exchanges will sometimes claim they have 'insurance,' the terms and conditions associated with that insurance are typically completely unknown to investors, and often this insurance will bear little to no resemblance to FDIC insurance; in essence the term 'insurance' is used as a marketing ploy to help instill customer confidence in the exchange, even when such confidence may not be warranted. *Id.*

72.    Due to the aforementioned reasons and risks surrounding the lack of regulation, as well various types of cybersecurity-related risks that aren't applicable to banks but are critically important for exchanges, cryptocurrency exchanges are generally not and should not be considered a 'safe' place to store assets, whether cryptocurrency assets or fiat assets. Ex. D ¶ 24.

73.    The inherent riskiness associated with storing assets on a cryptocurrency exchange is well-known to the vast majority of well-educated and knowledgeable cryptocurrency users. Ex. D ¶ 25. This is evidenced by the frequent expression 'not your keys, not your coins,' essentially meaning that if you don't *control* the cryptocurrency in your account, it's not really yours. *Id.* 'Your' cryptocurrency belongs to the exchange if you elect to store it 'on' the exchange, and if they renege or are unable to fulfill their liability to you, you as the beneficial cryptocurrency owner of the cryptocurrency, have effectively lost your money. *Id.*

74.     This is further referenced by the extensive track record of the many cryptocurrency exchanges that have shut down and ultimately failed,[14] often in spectacular fashion. Ex. D ¶ 26. The most common reasons for an exchange's failure include:

    a)  The exchange borrowing against customer assets (either to fund business operations or lending them out in an effort to generate a profit) leading to insolvency.

    b)  The exchange trading or leveraging customer assets in an effort to generate a profit, leading to insolvency.

    c)  A hack or theft by an external actor

    d)  Embezzlement, or theft by an internal actor, typically founder(s) of the exchange

    e)  Disappeared suddenly, for no apparent reason (typically taking customer assets with them).

*Id.*

75.     When exchanges do shut down (and this happens relatively frequently) it rarely happens in an organized and orderly fashion, and it's incredibly rare for customers that had assets on the exchange to get all their assets back; in many cases, they end up getting nothing back. Ex. D ¶ 27.

76.     Suffice to say cryptocurrency exchanges are generally not a safe place to store assets, even amongst exchanges that don't offer a yield-bearing program. Ex. D ¶ 28. When exchanges have a yield-bearing program, or otherwise elect to leverage or loan our customer assets (with or without customer consent), it significantly increases the risk of the exchange failing and becoming insolvent. *Id.* Cryptocurrency exchanges can do a variety of things to minimize such risks and improve safety. *Id.* However, what an exchange says, and what they actually do are two different things entirely. *Id.* It is common for CEOs and executives of exchanges that have failed or in the process of failing to describe their exchange as 'safe,' 'secure,' 'well-regulated,' 'compliant,' 'transparent,' or in a good financial position even when the exact opposite is true. *Id.*

---

[14] https://www.cryptowisser.com/exchange-graveyard/ (accessed May 11, 2023).

1  FTX was not an exception to this trend. One should not assume or believe that an exchange is any

2  of these things just because they say it. *Id.*

3         77.    This is not to suggest that exchanges cannot be a much safer place to store assets.

4  Ex. D ¶ 29. They can be with appropriate regulation and oversight. In fact, it appears that for FTX

5  Japan[15] specifically, those investors will be made whole or almost whole due to sensical

6  regulations that were put in place in light of the lessons learned from the failures of Mt. Gox and

7  Coincheck exchanges in Japan. *Id.*

8

9         ***Sam Bankman-Fried***

10         78.    The FTX Group was founded in 2019 and began as an exchange or marketplace for

11  the trading of crypto assets. FTX was established by Samuel Bankman-Fried, Gary (Zixiao) Wang

12  and Nishad Singh, with operations commencing in May 2019. FTX was purportedly established

13  in order to build a digital asset trading platform and exchange for the purpose of a better user

14  experience, customer protection, and innovative products. FTX built the FTX.com exchange to

15  develop a platform robust enough for professional trading firms and intuitive enough for first-time

16  users.

17         79.    Prior to that, the Silicon Valley-born, MIT-educated Bankman-Fried, also known

18  as SBF, launched his quantitative crypto trading firm, Alameda Research, in November 2017,[16]

19  after stints in the charity world and at trading firm Jane Street.[17] Quantitative trading consists of

20  trading strategies based on quantitative analysis, which rely on mathematical computations and

21  number crunching to identify trading opportunities.

22

23

24  [15] https://www.coindesk.com/consensus-magazine/2022/12/13/japan-was-the-safest-place-to-be-an-ftx-customer/

25  [16] https://www.businessinsider.com/ftx-crypto-king-sam-bankman-fried-rise-and-fall-2022-11 (accessed May 11, 2023).

26

27  [17] https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed May 11, 2023).

28

80.     On January 3, 2023, Bankman-Fried pled not guilty to eight criminal charges during a hearing before the U.S. District Court for the Southern District of California in USA v. SBF, 1:22-cr-00673-LAK-1. On February 23, 2023, a superseding indictment was unsealed. It added four more charges, including charges for conspiracy to commit bank fraud and unlicensed money transmitting business, and money laundering. Id., Doc. 80. With his trial scheduled for October 2023, Bankman-Fried faces over 100 years in prison for crimes predicated on his lying to investors and stealing billions of dollars of his customers' money. Defendants, while complicit in Bankman-Fried's misconduct, have thus far escaped criminal liability.

### *Caroline Ellison*

81.     By 2018, Bankman-Fried had persuaded Ellison to join him at Alameda Research. Ellison described the recruitment as follows: "This was very much like, 'oh, yeah, we don't really know what we're doing,'" Ellison told Forbes magazine in an interview regarding her initial impressions of Alameda.

82.     In late 2018, the headquarters of Alameda Research was relocated to Hong Kong. The team at Alameda Research included Bankman-Fried's close friends (and later co-founders for FTX) Nishad Singh and Gary Wang. Caroline Ellison was also part of the group and, upon moving to Hong Kong, the group lived like college students and fiercely traded crypto.

83.     After Bankman-Fried established FTX in 2019, Ellison began taking more responsibility at Alameda Research.

84.     In October 2021, Ellison was appointed as co-CEO of Alameda with Sam Trabucco after Bankman-Fried resigned from the firm in an effort to give the appearance of putting distance between the exchange and trading shop he founded. As co-CEO, Ellison helped oversee Alameda's expansion beyond its initial market-neutral, but relatively low-profit business as a market maker for low-volume cryptocurrencies into riskier trading strategies, according to a Twitter thread detailing that shift. For instance, Alameda traders began exploring yield farming in decentralized

finance (DeFi). Ellison became sole CEO in August 2022, following Trabucco's departure from the firm, when he shifted his role from Co-CEO to adviser of the company.[18]

85.     Leading up to the collapse of FTX, Ellison lived with nine other FTX or Alameda colleagues in Bankman-Fried's $30 million penthouse in the Bahamas. She reportedly paid SBF rent, and was occasionally in a romantic relationship with him. In 2021, Ellison tweeted about recreational stimulant use. Upon information and belief, Ellison left the Bahamas and moved back to Hong Kong.

86.     "Young people tend to be too risk averse," Ellison said in a more recent Alameda podcast episode.[19]

87.     In December 2022, Ellison pled guilty to criminal charges stemming from FTX's collapse, including conspiracy to commit wire fraud, conspiracy to commit commodities fraud, conspiracy to commit securities fraud, and conspiracy to commit money laundering. In entering her guilty plea, she told a federal judge in Manhattan:

> From approximately March 2018 through November 2022, I worked at Alameda Research, a cryptocurrency trading firm principally owned by Sam Bankman-Fried.
>
> From 2019 through 2022, I was aware that Alameda was provided access to a borrowing facility on FTX.com, the cryptocurrency exchange run by Mr. Bankman-Fried. I understood that FTX executives had implemented special settings on Alameda's FTX.com account that permitted Alameda to maintain negative balances in various fiat currencies and crypto currencies. In practical terms, this arrangement permitted Alameda access to an unlimited line of credit without being required to post collateral, without having to pay interest on negative balances and without being subject to margin calls or FTX.com's liquidation protocols. I understood that if Alameda's FTX accounts had significant negative balances in any particular currency, it meant that Alameda was borrowing funds that FTX's customers had deposited onto the exchange.
>
> While I was co-CEO and then CEO, I understood that Alameda had made numerous large illiquid venture investments and had lent money to Mr. Bankman-Fried and other FTX executives. I also understood that Alameda had financed these

---

[18]     https://www.coindesk.com/business/2022/08/24/co-ceo-of-crypto-trading-firm-alameda-research-sam-trabucco-steps-down/ (accessed May 11, 2023).

[19]     https://www.youtube.com/watch?v=zfcb9JAgWBs (accessed May 11, 2023).

investments with short-term and open-term loans worth several billion dollars from external lenders in the cryptocurrency industry. When many of those loans were recalled by Alameda's lenders in and around June 2022, I agreed with others to borrow several billion dollars from FTX to repay those loans. I understood that FTX would need to use customer funds to finance its loans to Alameda. I also understood that many FTX customers invested in crypto derivatives and that most FTX customers did not expect that FTX would lend out their digital asset holdings and fiat currency deposits to Alameda in this fashion. From in and around July 2022 through at least October 2022, I agreed with Mr. Bankman-Fried and others to provide materially misleading financial statements to Alameda's lenders. In furtherance of this agreement, for example, we prepared certain quarterly balance sheets that concealed the extent of Alameda's borrowing and the billions of dollars in loans that Alameda had made to FTX executives and to related parties. I also understood that FTX had not disclosed to FTX's equity investors that Alameda could borrow a potentially unlimited amount from FTX, thereby putting customer assets at risk. I agreed with Mr. Bankman-Fried and others not to publicly disclose the true nature of the relationship between Alameda and FTX, including Alameda's credit arrangement.

I also understood that Mr. Bankman-Fried and others funded certain investments in amounts more than $10,000 with customer funds that FTX had lent to Alameda. The investments were done in the name of Alameda instead of FTX in order to conceal the source and nature of those funds. I am truly sorry for what I did. I knew that it was wrong. And I want to apologize for my actions to the affected customers of FTX, lenders to Alameda and investors in FTX. Since FTX and Alameda collapsed in November 2022, I have worked hard to assist with the recovery of assets for the benefit of customers and to cooperate with the government's investigation. I am here today to accept responsibility for my actions by pleading guilty.[20]

88.     The Wall Street Journal recently reported that Ellison told Alameda staffers in a video call that she was one of four people (along with Sam Bankman-Fried, Gary Wang, and Nishad Singh) who were aware of the decision to send FTX customer funds to Alameda, to help the fund meet its liabilities.[21]

---

[20]     https://www.johnreedstark.com/wp-content/uploads/sites/180/2022/12/Ellison-Hearing-Transcript.pdf (accessed May 11, 2023)

[21]     https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238 (accessed May 11, 2023).

*Gary Wang*

89.     Wang is not like his co-founder Sam Bankman-Fried, who loves fame and putting himself at the center of public attention. In fact, there's little public information about Wang, who has been described as a shady but critical player in the rise and fall of FTX.

90.     Wang met Bankman-Fried at a math camp in high school. Later, they became college roommates at the Massachusetts Institute of Technology, where Wang got degrees in mathematics and computer science and Bankman-Fried received a bachelor's in physics.[22]

91.     Before co-founding Alameda Research (and later FTX), Wang worked at Google. He claims to have built a system to aggregate prices across public flight data, according to an introduction on the Future Fund's website.[23] When Bankman-Fried left the Jane Street Hedge Fund to start Alameda in 2017, Wang left the tech giant.

92.     The startup has its beginnings in a three-bedroom Berkeley apartment – the downstairs served as its office. The firm shifted to Hong Kong, in part to take advantage of arbitrage opportunities in Asian bitcoin markets – including the price discrepancy between BTC in Japan and BTC everywhere else.

93.     It's there that Wang and Bankman-Fried funneled funds from Alameda to build its bespoke derivatives exchange. Bankman-Fried told Insider that he is not a good coder: "I don't code. I'm trash. I have not written any of FTX's code base. That's all a lot of other really impressive people at FTX. That's not me at all."[24]

94.     Wang, one of the 10 roommates in Bankman-Fried' luxury penthouse in the Bahamas, is reportedly among the four people cited by Caroline Ellison who knew about the

---

[22] https://blog.ftx.com/blog/raising-the-bar/ (accessed May 11, 2023)

[23] https://ftxfuturefund.org/about/ (accessed May 11, 2023).

[24] https://www.businessinsider.com/crypto-trading-billionaire-sam-bankman-fried-ftx-alameda-surprising-facts-2021-12#5-people-often-think-hes-a-programmer-but-hes-not-5 (accessed May 11, 2023).

CLASS ACTION COMPLAINT

decision to send customer funds to Alameda, according to people who spoke to the Wall Street Journal.[25]

95.     At the age of 28, Wang topped Forbes' 2022 list of the world's billionaires under 30 with a net worth of $5.9 billion in April. SBF sent his congratulations to Wang in public, tweeting that "I couldn't be prouder" when the list came out.[26]

96.     In December 2022, Wang pled guilty to criminal charges stemming from FTX's collapse, including conspiracy to commit wire fraud, conspiracy to commit commodities fraud, and conspiracy to commit securities fraud. In entering his guilty plea, he told a federal judge in Manhattan:

> Between 2019 and 2022, as part of my employment at FTX, I was directed to and agreed to make certain changes to the platform's code. I executed those changes, which I knew would Alameda Research special privileges on the FTX platform. I did so knowing that others were representing to investors and customers that Alameda had no such special privileges and people were likely investing in and using FTX based in part on those misrepresentations. I knew what I was doing was wrong. I also knew that the misrepresentations were being made by telephone and internet, among other means, and that assets traded on FTX included some assets that the U.S. regulators regard as securities and commodities.

### Nishad Singh

97.     Nishad Singh joined Alameda Research in the early days, when the five-person trading firm was based in a Berkeley, California, apartment. He went from finding and exploiting arbitrage opportunities in crypto markets to being appointed director of engineering at FTX.

---

[25] https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238?mod=latest_headlines (accessed May 11, 2023).

[26] https://twitter.com/SBF_FTX/status/1511324242612297738?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1511324242612297738%7Ctwgr%5E8e0ce65ea02f827b72be9 6dde8f9484a3ba3e41c%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fwww.usatoday.com%2Fs tory%2Fmoney%2F2022%2F04%2F05%2Fcryptocurrency-ceo-donate-charity%2F7272175001%2F (accessed May 11, 2023).

98.     Singh is thought to be a close confidant of Bankman-Fried, having shared multiple apartments with the FTX founder over the years, including most recently a 10-person luxury penthouse in Nassau, the Bahamas.

99.     He is rumored to be just one of three people who controlled the keys to the exchange's matching engine, and may have been informed of a plan to backstop losses at Alameda with FTX customer funds.[27]

100.    Although Singh's LinkedIn profile is down and his Twitter account is locked, the University of California, Berkeley graduate talked about why he left his dream job at Facebook to join Alameda Research in a FTX podcast.[28]

101.    "I spent maybe about a month doing weekends and nights at Alameda," he said, discussing a period of time when his "day job" was as a software engineer working on applied machine learning at Facebook. "At some point, it became obvious that was kind of stupid … so I took some time off and really gave my 100% working at Alameda," Singh said.

102.    Singh visited Alameda in the first month of its existence, where he witnessed Bankman-Fried execute a sequence of trades that he described as "super profitable, easy to understand and there were lots available." Feeling inspired, he took a job.

103.    After spending one and a half years as a core Alameda engineer, Singh took a role as the head of engineering at the then-newly launched FTX derivative exchange in 2019, where he was allowed to code with "minimal supervision." He has provided code to a number of Bankman-Fried-related projects, including the decentralized exchange Serum on Solana.

104.    "Nishad was one of my brother's best friends in high school. He's shown the fastest and most sustained professional growth I've ever witnessed," Bankman-Fried wrote in a company

---

[27] https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238?mod=latest_headlines (accessed May 11, 2023).

[28] https://www.youtube.com/watch?v=rl0Rq2cUSIQ (accessed May 11, 2023).

CLASS ACTION COMPLAINT

blog.[29] Singh also reportedly built most of FTX's "technological infrastructure" and managed the development team.

105.   Although pitched as a community-run and- organized exchange, people familiar with the matter told CoinDesk the true power over Serum rested with FTX Group, which then held the program's access keys.[30] A similar relationship may be in place at FTX's core properties.[31]

106.   On February 28, 2023, Nishad Singh, who was one of SBF's best friends, a core Alameda engineer, and head of FTX's engineering, also pled guilty to criminal counts for conspiracy to commit fraud and conspiracy to commit money laundering. He agreed to cooperate with prosecutors' investigation into Bankman-Fried, apologized for his role in FTX's scheme, and admitted that he knew by mid-2022 that Alameda was borrowing FTX customer funds and that customers were not aware.[32]

**B.   The Rise and Fall of FTX.**

107.   The FTX.com exchange was extremely successful since its launch. This year around $15 billion of assets are traded daily on the platform, which now represents approximately 10% of global volume for crypto trading. The FTX team has grown to over 300 globally. Although the FTX Group's primary international headquarters is in the Bahamas, its domestic US base of operations is located in Miami, Florida.[33]

---

[29] https://blog.ftx.com/blog/raising-the-bar/ (accessed May 11, 2023).

[30]        https://www.coindesk.com/business/2022/11/12/ftx-hack-spooks-solana-defi-community-igniting-revolution-at-alameda-controlled-serum-dex/ (accessed May 11, 2023).

[31]   https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238?mod=latest_headlines (accessed May 11, 2023).

[32]        https://www.reuters.com/legal/ftxs-singh-agrees-plead-guilty-us-criminal-charges-lawyer-says-2023-02-28/ (accessed May 11, 2023).

[33]   https://www.coindesk.com/business/2022/09/27/crypto-exchange-ftx-is-moving-its-us-headquarters-from-chicago-to-miami/ (accessed May 11, 2023).

108.   FTX quickly became one of the most utilized avenues for nascent investors to purchase cryptocurrency. By the time FTX filed for bankruptcy protection, customers had entrusted billions of dollars to it, with estimates ranging from $10-to-$50 **billion dollars**.

109.   Bankman-Fried got rich off FTX and Alameda, with the two companies netting $350 million and $1 billion in profit, respectively, in 2020 alone, according to Bloomberg.

110.   At his peak, Bankman-Fried was worth $26 billion. At 30, he had become a major political donor, gotten celebrities like the Defendants in this action to vociferously promote FTX, and secured the naming rights to the arena where the NBA's Miami Heat play.[34]

111.   In early November 2022, crypto publication CoinDesk released a bombshell report that called into question just how stable Bankman-Fried's empire really was.[35]

112.   Prior to the collapse of the FTX Group, Bankman-Fried's cryptocurrency empire was publicly ostensibly broken into two main parts: FTX (his exchange) and Alameda Research (his trading firm), both giants in their respective industries. But even though they are two separate businesses, the division breaks down in a key place: on Alameda's balance sheet, which was full of FTX – specifically, the FTT token issued by the exchange that grants holders a discount on trading fees on its marketplace. While there is nothing per se untoward or wrong about that, it shows Bankman-Fried's trading giant Alameda rests on a foundation largely made up of a coin that a sister company invented, not an independent asset like a fiat currency or another crypto. The situation adds to evidence that the ties between FTX and Alameda are unusually close.[36]

113.   After obtaining this information, Changpeng "CZ" Zhao, the CEO of Binance, decided to liquidate roughly $530 million-worth of FTT. Customers also raced to pull out, and

---

[34]   https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed May 11, 2023).

[35]   https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed May 11, 2023).

[36]   https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/ (accessed May 11, 2023).

FTX saw an estimated $6 billion in withdrawals over the course of 72 hours, which it struggled to fulfill.[37] The value of FTT plunged 32%, but rallied once again with Bankman-Fried's surprise announcement on Tuesday, November 8th, that Binance would buy FTX, effectively bailing it out.[38]

114.    The next day, Binance announced that it was withdrawing from the deal, citing findings during due diligence, as well as reports of mishandled customer funds and the possibility of a federal investigation.[39] The news sent FTT plunging even further — Bankman-Fried saw 94% of his net worth wiped out in a single day.[40]  This triggered panic selling of FTT and a run on FTX, thereby ensuring the firm's swift demise.

115.    Bankman-Fried issued a 22-tweet-long explanation of where he believed he and the FTX Group went wrong:[41]



---

[37]    https://markets.businessinsider.com/news/currencies/ftx-6-billion-withdrawals-72-hours-sam-bankman-fried-binance-2022-11 (accessed May 11, 2023).

[38]    https://markets.businessinsider.com/news/currencies/ftx-6-billion-withdrawals-72-hours-sam-bankman-fried-binance-2022-11 (accessed May 11, 2023).

[39]    https://markets.businessinsider.com/news/currencies/ftx-crash-sec-cftc-probes-asset-liability-shortfall-6-billion-2022-11 (accessed May 11, 2023).

[40]    https://www.businessinsider.com/ftx-ceo-crypto-binance-sam-bankman-fried-wealth-wiped-out-2022-11 (accessed May 11, 2023).

[41]    https://twitter.com/SBF_FTX/status/1590709189370081280 (accessed May 11, 2023).

CLASS ACTION COMPLAINT



CLASS ACTION COMPLAINT



**SBF** ✓ @SBF_FTX · Nov 10

6) My sense before:

Leverage: 0x
USD liquidity ready to deliver: 24x average daily withdrawals

Actual:

Leverage: 1.7x
Liquidity: 0.8x Sunday's withdrawals

Because, of course, when it rains, it pours.  We saw roughly $5b of withdrawals on Sunday--the largest by a huge margin.

◯ 241          ⟲ 907          ♡ 3,823          ⬆

**SBF** ✓ @SBF_FTX · Nov 10

7) And so I was off twice.

Which tells me a lot of things, both specifically and generally, that I was shit at.

And a third time, in not communicating enough.  I should have said more.  I'm sorry--I was slammed with things to do and didn't give updates to you all.

◯ 116          ⟲ 278          ♡ 2,882          ⬆



**SBF** ✓ @SBF_FTX · Nov 10

8) And so we are where we are.  Which sucks, and that's on me.

I'm sorry.

◯ 155          ⟲ 357          ♡ 3,122          ⬆

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



CLASS ACTION COMPLAINT





SBF ✔ @SBF_FTX · Nov 10

13) Because at the end of the day, I was CEO, which means that *I* was responsible for making sure that things went well.  *I*, ultimately, should have been on top of everything.

I clearly failed in that.  I'm sorry.

💬 180          ↺ 423          ♡ 4,122          ⬆



SBF ✔ @SBF_FTX · Nov 10

14) So, what does this mean going forward?

I'm not sure--that depends on what happens over the next week.

But here are some things I know.

💬 129          ↺ 235          ♡ 2,502          ⬆



SBF ✔
@SBF_FTX

15) First, one way or another, Alameda Research is winding down trading.

They aren't doing any of the weird things that I see on Twitter--and nothing large at all.  And one way or another, soon they won't be trading on FTX anymore.

9:13 AM · Nov 10, 2022 · Twitter Web App

**405** Retweets   **201** Quote Tweets   **3,911** Likes

💬          ↺          ♡          ⬆

CLASS ACTION COMPLAINT



SBF ✓ @SBF_FTX · Nov 10
Replying to @SBF_FTX
16) Second, in any scenario in which FTX continues operating, its first priority will be radical transparency--transparency it probably always should have been giving.

Giving as close to on-chain transparency as it can: so that people know *exactly* what is happening on it.

💬 214          ⟳ 320          ♡ 2,255          ⬆

SBF ✓ @SBF_FTX · Nov 10
17) All of the stakeholders would have a hard look at FTX governance.  I will not be around if I'm not wanted.

All of the stakeholders--investors, regulators, users--would have a large part to play in how it would be run.

Solely trust.

💬 137          ⟳ 198          ♡ 1,878          ⬆

SBF ✓ @SBF_FTX · Nov 10
18) But all of that isn't what matters right now--what matters right now is trying to do right by customers.  That's it.

💬 144          ⟳ 158          ♡ 1,970          ⬆

SBF ✓ @SBF_FTX · Nov 10
19) A few other assorted comments:

This was about FTX International.  FTX US, the US based exchange that accepts Americans, was not financially impacted by this shitshow.

It's 100% liquid.  Every user could fully withdraw (modulo gas fees etc).

Updates on its future coming.

💬 406          ⟳ 760          ♡ 2,776          ⬆

CLASS ACTION COMPLAINT





116.     On November 11th, unable to obtain a bailout, FTX filed for Chapter 11 bankruptcy and Bankman-Fried resigned as CEO.[42]

117.     According to a recent Reuters report, however, another explanation contributing to the precarious house of cards that was the Deceptive FTX Platform is that earlier this year, Bankman-Fried secretly transferred *at least $4 billion* in customer funds from FTX to Alameda

---

[42]     https://markets.businessinsider.com/news/currencies/ftx-bankruptcy-sam-bankman-fried-ceo-crypto-binance-alameda-markets-2022-11 (accessed May 11, 2023).

without telling anyone, after Alameda was hit with a series of losses, and that the FTX Group lent more than *half* of its *$16 billion* in *customer funds* to Alameda in total, with more than *$10 billion in loans outstanding*.[43]

118.    While we are still learning exactly what happened at FTX and Alameda in the days and months before their collapse, we do know several pieces of information that are relevant to this litigation.

119.    First, it is quite possible that fiat currency FTX customers sent to the exchange for the purpose of purchasing cryptocurrency may never have actually resulted in a cryptocurrency transaction. Instead, Alameda may have used those funds to purchase any number of assets, including investing in venture capital firms (Alameda's balance sheet in John Ray's first day declaration list venture capital assets).

120.    Second, when customers withdrew cryptoassets from FTX in the past, FTX was likely meeting these withdrawals by selling FTT. However, as the price of FTT fell in the wake of Zhao's tweet, it became increasingly expensive for FTX to convert FTT into other cryptoassets that matched customers' expectations of their portfolio holding – especially as so many FTX customers were seeking to pull their cryptoassets out of the exchange at the same time.

121.    Therefore, while customers may have believed they were buying cryptocurrencies that were not securities (i.e., commodities) the economic reality was that they were directly, or indirectly, buying securities in the form of venture capital investments, FTT, SOL, and/or SRM. Another way to think of it is that FTX and all its affiliated entities were essentially economically akin to a venture capital fund, where "investors," in the form of customers, sent funds to the firm and the firm then did whatever it wanted with these funds, including purchasing securities. The

---

[43]    https://markets.businessinsider.com/news/currencies/ftx-crash-client-funds-alameda-binance-sbf-sec-cftc-probe-2022-11?utm_medium=ingest&utm_source=markets (accessed May 11, 2023).

difference is that FTX, unlike venture capital funds generally, was misrepresenting what it was doing with customers' assets.

122.   Given these facts, it appears that any person who used FTX was engaged in a securities transaction of some kind, knowingly or unknowingly.

123.   Thus, as will be illustrated below, the FTX Brand Ambassador Defendants' promotion of "FTX"—be it the Deceptive FTX Platform, YBAs, and/or FTT—was necessarily the promotion of unregistered securities.

124.   At or around the same time as Bankman-Fried's *mea culpa* tweets and discussions with reporters, an FTX balance sheet was leaked which shows that FTX held approximately $900 million in liquid assets against $8.9 billion of liabilities, with a negative $8 billion entry described as a "hidden, poorly internally labeled fiat@ account."[44]

125.   Later, the Wall Street Journal reported that in a video meeting with Alameda employees on November 9, 2022 (the day prior to Bankman-Fried's November 10, 2022 litany of tweets), Alameda CEO Caroline Ellison said that she, Bankman-Fried, and two other FTX executives, Singh and Wang, were aware of the decision to send customer funds directly to Alameda. Ellison even admitted that "FTX used customer money to help Alameda meet its liabilities."[45] Ellison elaborated on these statements on the record when pleading guilty to eight counts of conspiracy to commit wire fraud, securities fraud, and money laundering, among other conspiracies.[46]

126.   CNBC also reported on the relationship among FTX and Alameda, citing "a source familiar with company operations," that Alameda "was able to quietly use customer funds from .

---

[44]      https://www.bloomberg.com/opinion/articles/2022-11-14/ftx-s-balance-sheet-was-bad#xj4y7vzkg (last accessed February 22, 2023)

[45]      https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238 (last accessed February 22, 2023)

[46]      https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238 (last accessed December 16, 2022).

CLASS ACTION COMPLAINT

1  . . FTX in a way that flew under the radar of investors, employees and auditors in the process." It

2  did so "using billions from FTX users without their knowledge." CNBC's report explains that

3  FTX, as a crypto exchange, needed to hold enough cash to match customer deposits in the event

4  customers wanted to cash out. "They needed the same cushion, if not more, in the event that a user

5  borrows money to make a trade. According to the source, FTX did not have nearly enough on

6  hand."[47]

7      127.    The same source explained that FTX's biggest customer was Alameda, which,

8  instead of holding money, was borrowing billions from FTX users using FTX's in-house

9  cryptocurrency, FTT token, as collateral, then trading it. When the price of the FTT nosedived

10  75% in a day, making the collateral insufficient to cover the trade, both FTX and Alameda suffered

11  massive liquidity crises. *Id.*

12      128.    On December 13, 2022, the SEC filed a civil action against Bankman-Fried for

13  securities fraud in the United States District Court for the Southern District of New York. *SEC v.*

14  *SBF*, 1:22-cv-10501, Doc. 1 (S.D.N.Y.) In that complaint, the SEC alleged:

15  
16      From at least May 2019 through November 2022, Bankman-Fried engaged in a
17      scheme to defraud equity investors in FTX Trading Ltd. ("FTX"), the crypto
    asset trading platform of which he was CEO and co-founder, at the same time
    that he was also defrauding the platform's customers. Bankman-Fried raised
18      more than $1.8 billion from investors, including U.S. investors, who bought an
    equity stake in FTX believing that FTX had appropriate controls and risk
19      management measures. Unbeknownst to those investors (and to FTX's trading
    customers), Bankman-Fried was orchestrating a massive, years-long fraud,
20      diverting billions of dollars of the trading platform's customer funds for his own
    personal benefit and to help grow his crypto empire. *Id.* ¶ 1.

21      [F]rom the start, Bankman-Fried improperly diverted customer assets to his
22      privately-held crypto hedge fund, Alameda Research LLC ("Alameda"), and
    then used those customer funds to make undisclosed venture investments, lavish
23      real estate purchases, and large political donations. *Id.* ¶ 2.

24      When prices of crypto assets plummeted in May 2022, Alameda's lenders
25      demanded repayment on billions of dollars of loans. Despite the fact that

26  

27  [47]    https://www.cnbc.com/2022/11/13/sam-SBFs-alameda-quietly-used-ftx-customer-funds-without-raising-alarm-bells-say-sources.html (last accessed May 4, 2023).

28

Alameda had, by this point, already taken billions of Bankman-Fried of FTX customer assets, it was unable to satisfy its loan obligations. Bankman-Fried directed FTX to divert billions more in customer assets to Alameda to ensure that Alameda maintained its lending relationships, and that money could continue to flow in from lenders and other investors. *Id.* ¶ 4.

Through the summer of 2022, he directed hundreds of millions more in FTX customer funds to Alameda, which he then used for additional venture investments and for "loans" to himself and other FTX executives.

129.    The SEC alleged that "Bankman-Fried diverted FTX customer funds to Alameda in essentially two ways: (1) by directing FTX customers to deposit fiat currency (e.g., U.S. Dollars) into bank accounts controlled by Alameda; and (2) by enabling Alameda to draw from a virtually limitless "line of credit" at FTX, which was funded by FTX customer accounts." *Id.* ¶ 32.

**C.    The FTX Group, Which Was Effectively One Entity Controlled By Bankman-Fried, Was Rife with Red Flags.**

130.    On April 9, 2023, Current FTX CEO John J. Ray III filed in the FTX Bankruptcy his First Interim Report to the Independent Directors on Control Failures at the FTX Exchanges. *See In re: FTX Trading Ltd.,* No. 1:22-bk-11068-JTD, ECF No. 1242-1 (Bankr. Dist. Del. Apr. 9, 2023), attached as **Exhibit E** (the "First Interim Rpt.").

131.    Defining the "FTX Group" as a de facto singular entity comprised of FTX Trading, FTX.US, and Alameda, collectively, Mr. Ray begins by explaining that:

the Debtors have had to overcome unusual obstacles due to the FTX Group's lack of appropriate record keeping and controls in critical areas, including, among others, management and governance, finance and accounting, as well as digital asset management, information security and cybersecurity. Normally, in a bankruptcy involving a business of the size and complexity of the FTX Group, particularly a business that handles customer and investor funds, there are readily identifiable records, data sources, and processes that can be used to identify and safeguard assets of the estate. Not so with the FTX Group.

Upon assuming control, the Debtors found a pervasive lack of records and other evidence at the FTX Group of where or how fiat currency and digital assets could be found or accessed, and extensive commingling of assets. This required the Debtors to start from scratch, in many cases, simply to identify the assets and liabilities of the estate, much less to protect and recover the assets to maximize the estate's value. This challenge was magnified by the fact that the Debtors took over

amidst a massive cyberattack, itself a product of the FTX Group's lack of controls, that drained approximately $432 million worth of assets on [November 11, 2022,] the date of the bankruptcy petition (the "November 2022 Breach"), and threatened far larger losses absent measures the Debtors immediately implemented to secure the computing environment.

Despite the public image it sought to create of a responsible business, the FTX Group was tightly controlled by a small group of individuals who showed little interest in instituting an appropriate oversight or control framework. These individuals stifled dissent, commingled and misused corporate and customer funds, lied to third parties about their business, joked internally about their tendency to lose track of millions of dollars in assets, and thereby caused the FTX Group to collapse as swiftly as it had grown. In this regard, while the FTX Group's failure is novel in the unprecedented scale of harm it caused in a nascent industry, many of its root causes are familiar: hubris, incompetence, and greed.

First Interim Rpt., 6–7.

132.    After summarizing the history of the three main FTX Group entities, the current efforts to retain advisors to assist in investigating the FTX Group's available financial records and interview witnesses, Mr. Ray provides a comprehensive review of the FTX Group's control failures that led to its eventual collapse, including (1) lack of management and governance controls; (2) lack of financial and accounting controls; and (3) lack of digital asset management, information security and cybersecurity controls. *Id.*, 11–37.

133.    According to Mr. Ray, "[t]he FTX Group lacked appropriate management, governance, and organizational structure," and the "management and governance of the FTX Group was largely limited to Bankman-Fried, Singh, and Wang. Among them, Bankman-Fried was viewed as having the final voice in all significant decisions." *Id.,* 11. The trio "controlled nearly every significant aspect of the FTX Group," despite being "not long out of college and with no experience in risk management or running a business," and "[b]oard oversight, moreover, was effectively non-existent." *Id.*

134.    The FTX Group also "lacked an appropriate organizational structure. Rather than having an ultimate parent company able to serve as a central point for decision-making that could also direct and control its subsidiaries, the FTX Group was organized as a web of parallel corporate chains with various owners and interest, all under the ultimate control of Bankman-Fried." *Id.,* 8.

The FTX Group dd not even have a comprehensive organizational chart until the end of 2021, lacked any tracking of intercompany relationships and ownership of particular entities, and "did not even have current and complete lists of who its employees were." *Id.,* 8–9.

135.   The FTX Group also suffered from a near complete failure to observe corporate formalities, especially when it came to managing the finances of the FTX Group, for instance:

a.   Failure to maintain "personnel who were experienced and knowledgeable enough to account accurately for assets and liabilities, understand and hedge against risk, or compile and validate financial reports," *Id.,* 11;

b.   Failure to maintain adequate "policies and procedures relating to accounting, financial reporting, treasury management, and risk management," *Id.*;

c.   Failure to maintain an accurate and appropriate accounting system, in that 56 FTX Group entities did not produce financial statements of *any* kind, 35 used QuickBooks in conjunction with Google documents, Slack communications, shared drives, and Excel spreadsheets, *Id.,* 12–13;

d.   Recordkeeping was so poor that Bankman-Fried described Alameda as "hilariously beyond any threshold of any auditor being able to even get partially through an audit," adding:

> Alameda is unauditable. I don't mean this in the sense of "a major accounting firm will have reservations about auditing it"; I mean this in the sense of "*we* are only able to ballpark what its balances are, let alone something like a comprehensive transaction history." We sometimes find $50m of assets lying around that we lost track of; such is life.

*Id.,* 14;

e.   "Key accounting reports necessary to understand the FTX Group's assets and liabilities, such as statements of cash flows, statements of equity, intercompany and related party transaction matrices, and schedules of customer entitlements, did not exist or were not prepared regularly," *Id.,* 14–15;

f.   the FTX Group "did not maintain reliable lists of bank or trading accounts, cryptocurrency wallets, or authorized signatories," and let "[t]housands of deposit checks . . . collect[] like junk mail," *Id.,* 15;

g.   "Although the FTX Group consisted of many, separate entities, transfers of funds among those entities were not properly documented, rendering tracing of funds extremely challenging," including using Slack, Signal, and Telegram with "disappearing messages" enabled, and often approving expenses and invoices on Slack by "emoji," *Id.*;

h.   "The FTX Group did not observe any discernable corporate formalities when it came to intercompany transactions. Assets and liabilities were routinely shuffled among the FTX Group entities and insiders without proper process or documentation. Alameda routinely provided funding for corporate expenditures (*e.g.*, paying salaries and other business expenses) whether for Alameda, for various other Debtors, or for FTX DM, and for venture investments or acquisitions whether for Alameda or for various other Debtors. Alameda also transferred funds to insiders to fund personal investments, political contributions, and other expenditures—some of which were nominally 'papered' as personal loans with below-market interest rates and a balloon payment due years in the future." *Id.,* 17;

i.   Often times, intercompany and insider transfers were recorded in a manner "that was inconsistent with the apparent purpose of the transfers," for instance, tens of millions of dollars being transferred from Alameda to Bankman-Fried, personally, but recorded in the general ledger as "Investment in Subsidiaries: Investments-Cryptocurrency," often times recorded in a way that intercompany transactions did not balance across relevant entities, nor were they recorded with specificity regarding which digital assets were involved in the transfer and their value when transferred, *Id.*;

CLASS ACTION COMPLAINT

j. On both FTX International and US exchanges, Alameda was a customer that traded "for its own account as well as engaging in market-making activities, and, in that capacity, it was granted extraordinary privileges by the FTX Group," such as granting Alameda "an effectively limitless ability to trade and withdraw assets from the exchange regardless of the size of Alameda's account balance, and to exempt Alameda from the auto-liquidation process that applied to other customers," effectively allowing it to borrow and/or withdraw up to $65 billion from the Deceptive FTX Platform, *Id.,* 18–22; and finally

k. There were "extensive deficiencies in the FTX Group's controls with respect to digital asset management, information security, and cybersecurity," which was "particularly surprising given that the FTX Group's business and reputation depended on safeguarding crypto assets," and "[a]s a result of these control failures," which included (i) maintaining the majority of customer assets in "hot" wallets that are easily hacked, (ii) failing to safeguard private keys but storing them in an Amazon Web Services account, (iii) failing to employ multi-signature capabilities or Multi-Party Computation, (iv) failing to restrict FTX Group employee user access to sensitive infrastructure, such as omnibus wallets holding billions of dollars in assets, and (v) failing to enforce multi-factor authentication for employees and other commonsense safeguards to protect customer assets and sensitive data—all of which leads to the irrefutable conclusion that "the FTX Group exposed crypto assets under its control to a grave risk of loss, misuse, and compromise, and lacked a reasonable ability to prevent, detect, respond to, or recover from a significant cybersecurity incident, including the November 2022 Breach." *Id.,* 22–37.

136. Mr. Ray concludes that "[t]he FTX Group's profound control failures placed its crypto assets and funds at risk from the outset." *Id.,* 39.

CLASS ACTION COMPLAINT

137.    To be sure, there are certainly enough red flags detailed over the previous 5 pages that any sophisticated investor vetting the FTX Group for a significant investment and/or partnership opportunity, like the FTX Brand Ambassador Defendants (as opposed to a general FTX Group customer, who would not be granted access to or entitled to ask for these internal materials when accessing the FTX Platform via computer or phone app), who is doing any modicum of due diligence would be able to identify enough warning signs to either ask additional questions or decline the opportunity to conduct further business together.

138.    Indeed, how the FTX Group could pass, for example, the due diligence process of the teams of executives and analysts who worked on the Golden State Warriors, or, frankly, the due diligence process for *any* of the sophisticated FTX Brand Ambassadors, like Curry, when he put his image, likeness, persona, and credibility on the line to induce Plaintiffs and the Class to invest in the Deceptive FTX Platform, YBAs, and/or FTT, is beyond the pale.

139.    The fact that these FTX Brand Ambassadors jumped at the opportunity to work with the FTX—and be paid millions, tens of millions, or even hundreds of millions in cash, equity stakes, and/or cryptocurrency to do so—is strong circumstantial evidence that these FTX Brand Ambassador Defendants had actual knowledge that the FTX Group was a fraudulent Ponzi scheme that was converting its customers' funds for its own use. Yet, they still participated in the FTX Group's scheme, and proximately caused the damages to the Plaintiffs and the Class.

**D.    The SEC's Consistent Approach to Cryptocurrency.**

### *Section 1.01 Overview*

140.    Despite the crypto industry's cries for "regulatory clarity," the SEC's stance on cryptocurrency has been clear and consistent from the beginning. Critics of the SEC's stance toward cryptocurrency overlook an important aspect of U.S. securities law – securities regulation is not meant to be precise but is instead intentionally drafted to be broad and all-encompassing; clarity is not just uncommon; it is deliberately avoided. This is why the definitions of "security" in Section 2(a)(1) of the Securities Act of 1933 (Securities Act), 15 U.S.C. 77b(a)(1), and Section 3(a)(10) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. 78c(a)(10), include

not only conventional securities, such as "stock[s]" and "bond[s]," but also the more general term "investment contract."

141.    Along these lines, in *Reves v. Ernst & Young*, the Supreme Court stated that:

"The fundamental purpose undergirding the Securities Acts is 'to eliminate serious abuses in a largely unregulated securities market.' *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 421 U.S. 849 (1975). **In defining the scope of the market that it wished to regulate, Congress painted with a broad brush. It recognized the virtually limitless scope of human ingenuity, especially in the creation of 'countless and variable schemes devised by those who seek the use of the money of others on the promise of profits**, *SEC v. W.J. Howey Co.*, 328 U.S. 293, 328 U.S. 299 (1946), and determined that the best way to achieve its goal of protecting investors was 'to define the term "security" in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security.' . . . Congress therefore did not attempt precisely to cabin the scope of the Securities Acts . . . Rather, it enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment." (emphasis added)"[48]

142.    Crafted to contemplate not only known securities arrangements at the time, but also any prospective instruments created by those who seek the use of others' money on the promise of profits, the definition of "security" is broad, sweeping, and designed to be flexible to capture new instruments that share the common characteristics of stocks and bonds. As Supreme Court Justice (and former SEC Commissioner (1935) and Chair (1936-37)) William O. Douglas opined in Superintendent of Insurance v. Bankers Life and Casualty Co.:

"We believe that section 10(b) and Rule 10b-5 prohibit all fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety fraud, or present a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws."

143.    Federal courts have already confirmed the SEC's jurisdiction in numerous crypto-related emergency asset freeze hearings where the issue is always considered and affirmed, same as it has been by hundreds of federal courts across the country since the *Howey* Decision, which

---

[48]https://scholar.google.com/scholar_case?case=18068523124125938239&q=Reves+v.+Ernst+%26+Young&hl=en&as_sdt=400006&as_vis=1 (accessed May 11, 2023).

the Supreme Court adopted over 75 years ago.[49] That decision resulted in the *Howey* Test, which is used to determine the presence of an investment contract. The *Howey* Test stipulates that an investment contract exists if there is an "investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others."[50] The *Howey* Test is the principal method used by the SEC to determine if a given cryptocurrency is a security.

144.   The SEC has used multiple distribution channels to share its message and concerns regarding crypto, digital trading platforms, initial coin offerings, and other digital asset products and services over the past decade. The SEC first made investors aware of the dangers of investing in cryptocurrency in 2013 when the Office of Investor Education and Advocacy issued an Investor Alert on "Ponzi Schemes Using Virtual Currencies."[51]

145.   A year later, the same office issued an Investor Alert on "Bitcoin and Other Virtual Currency-Related Investments."[52] In 2017, the Commission took the rare step of releasing a Section 21(a) Report of Investigation that looked at the facts and circumstances of The DAO, which offered and sold approximately 1.15 billion DAO Tokens in exchange for a total of approximately 12 million Ether ("ETH") over a one-month period in 2016.[53] The SEC applied the *Howey* Test to the DAO tokens and concluded they were securities under the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"). While The DAO, and DAO tokens, were no longer operational at the time due to a high-profile hack that resulted in the theft of most DAO tokens, the Commission chose to release the report so as "to advise those who would use a Decentralized Autonomous Organization ("DAO Entity"), or other

---

[49] https://supreme.justia.com/cases/federal/us/328/293/ (accessed May 11, 2023).

[50] Id.

[51] ia_virtualcurrencies.pdf (sec.gov) (accessed May 11, 2023).

[52] Investor Alert: Bitcoin and Other Virtual Currency-Related Investments | Investor.gov (accessed May 11, 2023).

[53] https://www.sec.gov/litigation/investreport/34-81207.pdf (accessed May 11, 2023).

distributed ledger or blockchain-enabled means for capital raising, to take appropriate steps to ensure compliance with the U.S. federal securities laws."[54]

146.    In 2019, the SEC released a "Framework for "Investment Contract" Analysis of Digital Assets" which provided additional details on when a digital asset has the characteristics of an investment contract and "whether offers and sales of a digital asset are securities transactions."[55]

147.    In addition, the SEC has publicized its position on cryptocurrency in countless enforcement actions,[56] multiple speeches,[57] Congressional testimony,[58] and several official SEC statements[59] and proclamations.[60] Current SEC Chairman, Gary Gensler, has spoken frequently about the perils and illegality of crypto lending platforms and decentralized finance,[61] warning that their failure to register with the SEC may violate U.S. securities laws.[62] In one interview, Gensler said:

> "The law is clear, it's not about waving a wand. Congress spoke about this in 1934 . . . When a [digital] platform has securities on it, it is an exchange, and it's a question of

---

[54] Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO (accessed May 11, 2023).

[55] SEC.gov | Framework for "Investment Contract" Analysis of Digital Assets (accessed May 11, 2023).

[56] SEC.gov | Crypto Assets and Cyber Enforcement Actions (accessed May 11, 2023).

[57] https://www.sec.gov/news/speech/gensler-aspen-security-forum-2021-08-03 (accessed May 11, 2023).

[58] https://www.sec.gov/news/testimony/gensler-2021-05-26 (accessed May 11, 2023).

[59] https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11 (accessed May 11, 2023).

[60] https://www.sec.gov/news/public-statement/enforcement-tm-statement-potentially-unlawful-online-platforms-trading (accessed May 11, 2023).

[61] https://www.theblock.co/post/113416/gensler-speech-crypto-defi-lending-sec (accessed May 11, 2023).

[62] https://ca.finance.yahoo.com/news/crypto-platforms-dont-register-with-sec-outside-the-law-gensler- 164215740.html (accessed May 11, 2023).

CLASS ACTION COMPLAINT

whether they're registered or they're operating outside of the law and I'll leave it at that."[63]

148.    On September 8, 2022, Chair Gensler gave a speech reflecting on the flexibility of the securities laws and the SEC's consistency in applying these laws to cryptocurrency.[64] Gensler noted that of the 10,000 different cryptocurrencies in the market, "the vast majority are securities," a position that was also held by his predecessor, Jay Clayton.[65] Gensler went on to note that the SEC has spoken with a "pretty clear voice" when it comes to cryptocurrency "through the DAO Report, the Munchee Order, and dozens of Enforcement actions, all voted on by the Commission" and that "[n]ot liking the message isn't the same thing as not receiving it."[66]

149.    The judicial record supports Chair Gensler's assertions. The SEC has taken over 100 crypto-related enforcement actions and has not lost a single case.[67]

150.    What follows are summaries of five cases that will help inform this litigation.

### Section 1.02 SEC v. KIK

151.    In Kik[68], the SEC's complaint[69], filed in the U.S. District Court for the Southern District of New York on June 4, 2019, alleged that Kik sold digital asset securities to U.S. investors without registering their offer and sale as required by the U.S. securities laws. Kik argued that the SEC's lawsuit against it should be considered "void for vagueness."[70]

---

[63] https://www.theblock.co/post/113416/gensler-speech-crypto-defi-lending-sec (accessed May 11, 2023).

[64] SEC.gov | Kennedy and Crypto (accessed May 11, 2023).

[65] Id.

[66] Id.

[67] SEC Cryptocurrency Enforcement: 2021 Update (cornerstone.com) (accessed May 11, 2023).

[68] https://www.sec.gov/news/press-release/2020-262 (accessed May 11, 2023).

[69] https://www.sec.gov/news/press-release/2019-87 (accessed May 11, 2023).

[70]      https://www.financemagnates.com/cryptocurrency/news/sec-seeks-to-block-kik-subpoenas-refutes-void-for-vagueness-claim/ (accessed May 11, 2023).

152.     The court granted the SEC's motion for summary judgment on September 30, 2020, finding that undisputed facts established that Kik's sales of "Kin" tokens were sales of investment contracts (and therefore of securities) and that Kik violated the federal securities laws when it conducted an unregistered offering of securities that did not qualify for any exemption from registration requirements. The court further found that Kik's private and public token sales were a single integrated offering.

### Section 1.03 SEC v. Telegram

153.     In Telegram,[71] the SEC filed a complaint[72] on October 11, 2019, alleging that the company had raised capital to finance its business by selling approximately 2.9 billion "Grams" to 171 initial purchasers worldwide. The SEC sought to preliminarily enjoin Telegram from delivering the Grams it sold, which the SEC alleged were securities that had been offered and sold in violation of the registration requirements of the federal securities laws.

154.     Telegram argued[73] that the SEC has "engaged in improper 'regulation by enforcement' in this nascent area of the law, failed to provide clear guidance and fair notice of its views as to what conduct constitutes a violation of the federal securities laws, and has now adopted an ad hoc legal position that is contrary to judicial precedent and the publicly expressed views of its own high-ranking officials."

155.     On March 24, 2020, the U.S. District Court for the Southern District of New York issued a preliminary injunction[74] barring the delivery of Grams and finding that the SEC had shown a substantial likelihood of proving that Telegram's sales were part of a larger scheme to distribute the Grams to the secondary public market unlawfully.

---

[71] https://www.sec.gov/news/press-release/2020-146 (accessed May 11, 2023).

[72] https://www.sec.gov/news/press-release/2019-212 (accessed May 11, 2023).

[73]     https://www.financemagnates.com/cryptocurrency/news/sec-vs-telegram-will-gram-tokens-ever-be-distributed/ (accessed May 11, 2023).

[74] SEC v. Telegram: A Groundbreaking Decision in Cryptocurrency Enforcement? | Insights | Greenberg Traurig LLP (gtlaw.com) (accessed May 11, 2023).

156.    Without admitting or denying the allegations in the SEC's complaint, the defendants consented to the entry of a final judgment enjoining them from violating the registration provisions of Sections 5(a) and 5(c) of the Securities Act of 1933. The judgment ordered the defendants to disgorge, on a joint and several basis, $1,224,000,000.00 in ill-gotten gains from the sale of Grams, with credit for the amounts Telegram pays back to initial purchasers of Grams. It also ordered Telegram Group Inc. to pay a civil penalty of $18,500,000. For the next three years, Telegram is further required to give notice to the SEC staff before participating in the issuance of any digital assets.

### Section 1.04 SEC v. BlockFi

157.    In BlockFi Lending LLC, the first SEC case ever involving a crypto-lending program, on February 22, 2022, the SEC charged BlockFi [75] with failing to register the offers and sales of its retail crypto-lending product and also charged BlockFi with violating the registration provisions of the Investment Company Act of 1940.

158.    BlockFi argued for "increased regulatory clarity" but lost. [76]

159.    To settle the SEC's charges, BlockFi agreed to pay a $50 million penalty, cease its unregistered offers and sales of the lending product, BlockFi Interest Accounts (BIAs), and bring its business within the provisions of the Investment Company Act within 60 days. BlockFi's parent company also announced that it intends to register under the Securities Act of 1933 the offer and sale of a new lending product. In parallel actions, BlockFi agreed to pay an additional $50 million in fines to 32 states to settle similar charges.

### Section 1.05 SEC Wells Notice to Coinbase

160.    In 2021, Coinbase began marketing a cryptocurrency lending product called Lend. The Lend program purported to allow some Coinbase customers to "earn interest on select assets

---

[75] https://lnkd.in/d-Xy45ec (accessed May 11, 2023).

[76] https://blockfi.com/pioneering-regulatory-clarity (accessed May 11, 2023).

on Coinbase, starting with 4% APY on USD Coin (USDC)."[77] According to Coinbase, its lawyers reached out to the SEC to discuss its Lend product, at which point SEC staff instead served Coinbase with a *Wells Notice,* informing Coinbase of their intention to seek approval from the SEC Commissioners to file a civil enforcement action against Coinbase for violating the federal securities laws.

161.   According to Coinbase, the SEC issued the Wells Notice because of Coinbase's failure to file a registration statement with the SEC for the offering of its Lend product, which the SEC believed was a security.[78]

162.   The two cases that Coinbase claims the SEC cites as support for its *Wells* Notice are *SEC v. Howey* and *Reves v. Ernst & Young*. *Reves* addressed the question of whether a product is a "note" and hence a security (applying the so-called "Familial Resemblance Test").

163.   Under the Lend program, Coinbase customers were clearly investing "money" at Coinbase and placing their faith in Coinbase to generate a profit for them. Lend investors would have no say in how Coinbase runs the Lend program and Coinbase was not going to permit Lend investors to participant in Lend-related decisions. Given these facts, Lend was clearly an investment contract.

164.   Under *Reves*, Lend may have also been a "note" and hence a security. Although the term "note" is included in the statutory definition of a security, case law has determined that not every "note" is a security. The definition specifically excludes notes with a term of less than nine months and courts have carved out a range of exemptions over the years for commercial paper type notes such as purchase money loans and privately negotiated bank loans. To reconcile these varying cases, the U.S. Supreme Court in *Reves* established the "family resemblance test," to determine whether a note is a security.

---

[77] The SEC has told us it wants to sue us over Lend. We don't know why. - Blog (coinbase.com) (accessed May 11, 2023).

[78] *Id.*

165.    Per the "family resemblance test," a presumption that a note is a security can only be rebutted if the note bears a resemblance to one of the enumerated categories on a judicially developed list of exceptions, as follows: 1) a note delivered in consumer financing; 2) a note secured by a mortgage on a home; 3) a short-term note secured by a lien on a small business or some of its assets; 4) a note evidencing a character loan to a bank customer; 5) a short-term note secured by an assignment of accounts receivable; and 6) a note which simply formalizes an open-account debt incurred in the ordinary course of business (such as a trade payable for office supplies); and vii) a note evidencing loans by commercial banks for current operations.

166.    The "family resemblance" analysis requires:

- A consideration of the motivation of the seller and buyer (e.g. is the seller looking for investment and the buyer looking for profit?);

- The plan of distribution of the note (e.g. is the product being marketed as an investment?);

- The expectation of the creditor/investor (e.g. would the investing public reasonably expect the application of the securities laws to the product); and

- The presence of an alternative regulation (e.g. will the product be registered as a banking product and the offered registered as a bank?).

167.    Applying the family resemblance test to Lend reveals the presence of a note. First, Coinbase likened the Lend program to that of a savings account, where the Lend customer is looking for a profitable investment and Coinbase is looking for investors. Second, Coinbase marketed the Lend program as an investment. Third, investors (especially disgruntled ones) would certainly expect that securities regulation applies. Fourth, Coinbase is not a bank, so their so-called savings account falls under no other regulatory jurisdiction and protection.

168.    Given the clear facts of this case, Coinbase decided to cancel the Lend program.[79]

---

[79] Coinbase cancels Lend program launch after SEC fight - The Verge (accessed May 11, 2023).

CLASS ACTION COMPLAINT

**E.    FTX's offer and sale of YBAs, which are unregistered securities.**

169.    Beginning in 2019, the FTX Group began offering the YBAs to public investors through its Earn program. Plaintiff and other similarly situated individuals invested in FTX's YBAs.

170.    The details of the Earn program are still listed on the FTX website,[80] and additional information on Earn is described in a declaration submitted in the Voyager Chapter 11 proceedings by Joseph Rotunda, Director of Enforcement of the Texas State Securities Board, on October 14, 2022.[81]

171.    Under the section titled "How can I earn yield on my FTX deposits?" on the FTX website, the company describes the Earn program thusly:

> "You can now earn yield on your crypto purchases and deposits, as well as your fiat balances, in your FTX app! By opting in and participating in staking your supported assets in your FTX account, you'll be eligible to earn up to 8% APY on your assets."[82]

172.    On the same webpage, the company also states:

> The **first $10,000** USD value in your deposit wallets will earn **8%** APY. Amounts held **above $10,000 up to $100,000** USD in value (subject to market fluctuations) will earn **5%** APY.[83]

173.    Nowhere on the website does FTX describe how this yield will be generated; readers are given the impression that the yield will come from "staking your supported assets in your FTX account" although nowhere does the company describe what staking actually is.

174.    Staking is a technical concept that applies to the blockchain consensus mechanism called Proof of Stake, which some cryptocurrencies utilize.[84] Staking serves a similar function to

---

[80] FTX App Earn – FTX Exchange (accessed May 11, 2023).

[81] 1175310142280000000134.pdf (stretto.com) (accessed May 11, 2023).

[82] FTX App Earn – FTX Exchange (accessed May 11, 2023).

[83] *Id.*

[84] For example, Ethereum, Tezos, Cosmos, Solana, and Cardano all use Proof of Stake.

cryptocurrency mining, in that it is the process by which a network participant gets selected to add the latest batch of transactions to the blockchain and earn some crypto in exchange. While the exact mechanism will vary from project to project, in general, users will put their token on the line (i.e., "stake") for a chance to add a new block onto the blockchain in exchange for a reward. Their staked tokens act as a guarantee of the legitimacy of any new transaction they add to the blockchain. The network chooses validators based on the size of their stake and the length of time they've held it. Thus, the most invested participants are rewarded. If transactions in a new block are discovered to be invalid, users can have a certain amount of their stake burned by the network, in what is known as a slashing event.[85]

175.    Some within the crypto community argue that staking is not a security because it is simply part of the code by which specific cryptocurrencies operate. In other words, some argue that staking programs are different from lending programs because user assets are not actually being "lent" out to third parties. But in September 2022, SEC Chairman Gary Gensler told reporters that "cryptocurrencies and intermediaries that allow holders to 'stake' their coins might pass" the *Howey* Test.[86] According to Gensler, "From the coin's perspective…that's another indicia that under the *Howey* test, the investing public is anticipating profits based on the efforts of others." The Wall Street Journal noted that if an intermediary such as a crypto exchange offers staking services to its customers, Mr. Gensler said, it "looks very similar—with some changes of labeling—to lending."[87]

176.    Based upon information – included and not included – on the FTX website, it does not appear that the company is adhering to the technical, commonly understood, definition of

---

[85] The staking definition comes from the Coinbase website: What is staking? | Coinbase (accessed May 11, 2023).

[86] Ether's New 'Staking' Model Could Draw SEC Attention - WSJ (accessed May 11, 2023).

[87] Id.

1    staking. *See* Ex. B ¶¶ 36–42. The most telling indicator is that the company permits any

2    cryptocurrency listed on their platform to be eligible for staking, even coins that do not use Proof

3    of Stake. *Id.* ¶ 39. The FTX website specifically states that Bitcoin and Dogecoin can generate

4    yield under the Earn program, even though these coins use the Proof of Work consensus

5    mechanism (meaning you CANNOT technically stake Bitcoin or Dogecoin). Therefore, it is not

6    at all clear where the promised yield is coming from.

7         177.    As Mr. Sibenik explains, applying *Howey* to the FTX Earn program reveals that

8    Earn is an investment contract. An investment contract is present because users are clearly

9    entrusting their funds to FTX. Users have to "opt-in" so that FTX may take possession over user

10   assets and deploy them in a manner that will generate yield. As noted above, it is not clear how

11   that yield is generated, but it is clear that FTX is deploying customer assets in a discretionary

12   manner. Therefore, the efforts of FTX are instrumental in generating the users' yield and of course

13   users have an expectation of profit because FTX is advertising yields of up to 8% APY:

14              From a securities perspective, the Howey Test defines an investment contract as:
             a.   An investment of money
15                 i.   Cryptocurrency is a medium of exchange and way of transferring
16                      value in a measurable and quantifiable way. It is increasingly used
                        as a means of payment, although it is more commonly used as a
17                      speculative investment at this point in time. Whether or not
18                      cryptocurrency can be defined as 'money' is in part a matter of
                        semantics that can vary based on considers the fundamental features
19                      of money to be, and what criteria needs to be achieved in order for
20                      something to be considered money. Suffice to say, when examining
                        aspects such as fungibility, durability, portability, divisibility,
21                      scarcity, transferability, acting as a medium of exchange, acting as
22                      a unit of account, and acting as a store of value, it could be argued
                        that some cryptocurrencies fulfill many of these criterion as good as
23                      or even better than fiat currencies.
             b.   In a common enterprise
24                 i.   FTX customer assets are almost always consolidated in wallets
25                      operated an controlled by FTX at least initially. These wallets are
                        typically referred to as 'hot wallets' or 'consolidation wallets.' From
26                      these wallets, cryptocurrency can be move to other FTX-controlled
27                      wallets, or it can be used to pay back other customers performing
                        withdrawals, but FTX can and did send (and loan) out such assets to

28

1
2
3

other entities, including Alameda Research 'Alameda.' The blockchains data contains an immutable and verifiable record of data that shows that FTX customer deposits went into accounts operated by a common enterprise, namely, FTX.

4
5
6
7
8

   c.  With the expectation of profit

       i.  FTX customers are promised yield when they participate in the Earn program. And at up to 8% yield, that is a considerable amount that would be considerably in excess to that of a savings account at a bank. But it was also far riskier than investing money in a savings account at a bank. FTX goes out of their way to advertise this yield, and indicate that such earnings are to be calculated on the "investment portfolio" that is stored 'in' the FTX app.[88]

9
10
11
12

   d.  To be derived from the efforts of others

       i.  The FTX Yield-bearing account was portrayed as passive income stream. A customer needs to do nothing more than ensure they are subscribed to the yield program, and that they have deposited assets (of crypto or even fiat) in order to earn the 5% or 8% yield, which they clearly indicate is counted hourly. There is no further work or action needed on the part of the user.

13
14
15
16
17
18

       ii.  The work that 'others' (namely FTX) would need to do would including, at a baseline, sending transactions. But it would also require FTX to make an effort by leveraging and investing the money elsewhere which could theoretically come about either via giving out loans, employing trading strategies, 'staking,' making other investments, or giving out loans to entities (such as Alameda) that would employ such strategies. The primary strategy that FTX portrayed to investors was 'staking' as I discuss in the following paragraphs.

Ex. D, ¶ 43.

19
20
21
22
23
24

     178.    The FTX Earn program was most likely a note per *Reves* as well. First, FTX offered Earn to obtain crypto assets for the general use of its business, namely, to run its activities to pay interest to Earn investors, and users purchased YBAs and were automatically opted-in to Earn to receive interest on their crypto assets. Second, Earn was offered and sold to a broad segment of the general public. Third, FTX promoted Earn as an investment; on their website, FTX notes that

25
26
27
28

---

[88] https://help.ftx.com/hc/en-us/articles/10573545824532-FTX-App-Earn (accessed May 11, 2023).

Earn users will receive "yield earnings" on their "investment portfolio."[89] Fourth, no alternative regulatory scheme or other risk reducing factors exist with respect to Earn. Note that the above analysis mirrors that provided by the SEC in their BlockFi order.[90]

179.    FTX maintains that it does not offer for sale any product that constitutes a "security" under federal or state law. Under federal securities laws as construed by the United States Supreme Court in its decision *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) and by the SEC, an investment contract is a form of security under United States securities laws when (1) the purchaser makes an investment of money or exchanges another item of value (2) in a common enterprise (3) with the reasonable expectation of profits to be derived from the efforts of others.

180.    The YBAs were "securities" as defined by the United States securities laws and as interpreted by the Supreme Court, the federal courts, and the SEC. The FTX Group offered variable interest rewards on crypto assets held in the YBAs on the Deceptive FTX Platform, which rates were determined by the FTX Group in their sole discretion. In order to generate revenue to fund the promised interest, the FTX Group pooled the YBA assets to engage in lending and staking activities from which they derived revenue to pay interest on the YBAs. These activities make the YBAs a "security" under state and federal law.

181.    On October 14, 2022, Director of Enforcement of the Texas State Securities Board, Joseph Rotunda, filed a declaration in the Chapter 11 bankruptcy proceedings pending in connection with the collapse of the Voyager Digital cryptocurrency exchange, *In re: Voyager Digital Holdings, Inc., et al.*, Case No. 22-10943 (MEW), ECF No. 536 (Bankr. S.D.N.Y. Oct. 14, 2022), in which he explained how the YBAs are in fact "an offering of unregistered securities in the form of yield-bearing accounts to the residents of the United States." *Id.*, at 6. In his declaration, the pertinent portions of which are reproduced in full for ease of reference, Rotunda explains:

---

[89] FTX App Earn – FTX Exchange (accessed May 11, 2023).

[90] https://www.sec.gov/news/press-release/2022-26 (accessed May 11, 2023).

I am also familiar with FTX Trading LTD ("FTX Trading") dba FTX as described herein. As more fully explained throughout this declaration, I am aware that FTX Trading, along with West Realm Shires Services Inc. dba FTX US ("FTX US"), may be offering unregistered securities in the form of yield-bearing accounts to residents of the United States. These products appear similar to the yield-bearing depository accounts offered by Voyager Digital LTD et al., and the Enforcement Division is now investigating FTX Trading, FTX US, and their principals, including Sam Bankman-Fried.

I understand that FTX Trading is incorporated in Antigua and Barbuda and headquartered in the Bahamas. It was organized and founded in part by Mr. Bankman-Fried, and FTX Trading appears to be restricting operations in the United States. For example, domestic users accessing the webpage for FTX Trading at ftx.com are presented with a pop-up window that contains a disclaimer that reads in part as follows:

> Did you mean to go to FTX US? FTX US is a US licensed cryptocurrency exchange that welcomes American users.
> You're accessing FTX from the United States. You won't be able to use any of FTX.com's services, though you're welcome to look around the site.

FTX US claims to be regulated as a Money Services Business with FinCEN (No. 31000195443783) and as a money transmitter, a seller of payment instruments and in other non-securities capacities in many different states. It is not, however, registered as a money transmitter or in any other capacity with the Texas Department of Banking and it is not registered as a securities dealer with the Texas State Securities Board.

FTX US owns 75 percent or more of the outstanding equity of FTX Capital Markets (CRD No. 158816) ("FTX Capital"), a firm registered as a broker-dealer with the United States Securities and Exchange Commission, the Financial Industry Regulatory Authority Inc., and 53 state and territorial securities regulators. FTX Capital's registration as a dealer in Texas became effective on May 7, 2012, and the registration continues to remain in force and effect.

FTX US maintains a website at https://ftx.us that contains a webpage for smartphone applications for FTX (formerly Blockfolio)[91] (the "FTX Trading App") and FTX US Pro. Users appear able to click a link in this webpage to download the FTX Trading App even when they reside in the United States.

On October 14, 2022, I downloaded and installed the FTX Trading App on my smartphone. I created an account with FTX Trading through the FTX Trading App and linked the FTX account to an existing personal bank account. During the process, I provided my full first and last name and entered my residential address in Austin, Texas. I also accessed hyperlinks in the FTX Trading App that redirected to the Privacy Policy and Terms of Service. Although I was from the United States and was using the application tied to FTX Trading, the Privacy Policy and Terms of Service were from FTX US - not FTX Trading.

I thereafter used the FTX Trading App to initiate the transfer of $50.00 from my bank account to the FTX account and then transferred .1 ETH from a 3.0 wallet to the FTX account. The transfer of funds from my bank account to the FTX account will take up to six days to complete but the transfer of ETH was processed within a few minutes.

The FTX Trading App showed that I was eligible to earn a yield on my deposits. It also explained the "Earn program is provided by FTX.US" – not FTX Trading. It also represented that "FTX Earn rewards are available for US users on a promotional basis."

I recall the FTX Trading App's default settings were automatically configured to enable the earning of yield. The application also contained a link for additional information about yield. I accessed the link and was redirected to a recent

---

[91] Based upon information and belief, FTX Trading acquired Blockfolio LLC ("Blockfolio") in or around August 2020. At the time, Blockfolio managed a cryptocurrency application. FTX Trading appears to have thereafter rebranded Blockfolio and its smartphone application as FTX. Now, users can download the FTX Trading App from Apple's App Store or Google's Google Play Store. Although FTX rebranded Blockfolio, the application listing in Apple's App Store still shows the application with developed by Blockfolio.

CLASS ACTION COMPLAINT

article published by "Blockfolio Rebecca" under help.blockfolio.com. The article began as follows:

> You can now earn yield on your crypto purchases and deposits, as well as your fiat balances, in your FTX Trading App! By opting in and participating in staking your supported assets in your FTX account, you'll be eligible to earn up to 8% APY on your staked assets. THIS APY IS ESTIMATED AND NOT GUARANTEED AS DESCRIBED BELOW.

The article also described the payment of yield. It contained a section titled *How do you calculate APY?* Does my balance compound daily? that read, in part, as follows:

> FTX will deposit yield earnings from the staked coins, calculated hourly, on the investment portfolio that is stored in your FTX Trading App. Yield will be compounded on principal and yield you have already earned. Any cryptocurrency that you have deposited on FTX as well as any fiat balance you may have on your account, will earn yield immediately after you have opted into the program.
>
> The first $10,000 USD value in your deposit wallets will earn 8% APY. Amounts held above $10,000 up to $10MM USD in value (subject to market fluctuations) will earn 5% APY. In this scenario, your yield earned on the coins will look something like the examples below the table.

The article also contained a section titled Is this available in my country? This section explained that "FTX Trading App Earn is available to FTX Trading App customers that are in one of the FTX permitted jurisdictions." It contained a hyperlink to an article titled *Location Restrictions* published by FTX Crypto Derivatives Exchange under help.ftx.com. This article described various restrictions on operations in certain countries and locations and read in part as follows:

> **FTX** does not onboard or provide services to corporate accounts of entities located in, established in, or a resident of the **United States of America, Cuba, Crimea and Sevastopol, Luhansk People's Republic, Donetsk People's Republic, Iran, Afghanistan, Syria, or North Korea**. FTX also does not onboard corporate accounts located in or a resident of **Antigua or Barbuda**. FTX also does not onboard any users from Ontario, and FTX does not permit non-professional investors from Hong Kong purchasing certain products.

CLASS ACTION COMPLAINT

**FTX does not onboard or provide services to personal accounts of current residents of the United States of America, Cuba, Crimea and Sevastopol, Luhansk People's Republic, Donetsk People's Republic, Iran, Afghanistan, Syria, North Korea, or Antigua and Barbuda**. There may be partial restrictions in other jurisdictions, potentially including Hong Kong, Thailand, Malaysia, India and Canada. In addition, FTX does not onboard any users from Ontario, does not permit non-professional investors from Hong Kong purchasing certain products, and does not offer derivatives products to users from Brazil.

FTX serves all Japanese residents via FTX Japan.

(emphasis in original)

Despite the fact I identified myself by name and address, the FTX Trading App now shows that I am earning yield on the ETH. The yield is valued at 8 percent APR.

Based upon my earning of yield and an ongoing investigation by the Enforcement Division of the Texas State Securities Board, the yield program appears to be an investment contract, evidence of indebtedness and note, and as such appears to be regulated as a security in Texas as provided by Section 4001.068 of the Texas Securities Act. At all times material to the opening of this FTX account, FTX Trading and FTX US have not been registered to offer or sell securities in Texas. FTX Trading and FTX US may therefore be violating Section 4004.051 of the Texas Securities Act. Moreover, the yield program described herein has not been registered or permitted for sale in Texas as generally required by Section 4003.001 of the Securities Act, and as such FTX Trading and FTX US may be violation Section 4003.001 by offering unregistered or unpermitted securities for sale in Texas. Finally, FTX Trading and FTX US may not be fully disclosing all known material facts to clients prior to opening accounts and earning yield, thereby possibly engaging in fraud and/or making offers containing statements that are materially misleading or otherwise likely to deceive the public. Certain principals of FTX Trading and FTX US may also be violating these statutes and disclosure requirements. Further investigation is necessary to conclude whether

FTX Trading, FTX US and others are violating the Securities Act through the acts and practices described in this declaration.

The Enforcement Division of the Texas State Securities Board understands that FTX US placed the highest bid for assets of Voyager Digital LTD et al., a family of companies variously accused of misconduct in connection with the sale of securities similar to the yield program promoted by FTX Trading and FTX US. FTX US is managed by Sam Bankman-Fried (CEO and Founder), Gary Wang (CTO and Founder) and Nishad Singh (Head of Engineering). The same principals hold the same positions at FTX Trading, and I was able to access the yield-earning product after following a link to the FTX Trading App from FTX US's website. The FTX Trading App also indicated the Earn program is provided by FTX US. As such, FTX US should not be permitted to purchase the assets of the debtor unless or until the Securities Commissioner has an opportunity to determine whether FTX US is complying with the law and related and/or affiliated companies, including companies commonly controlled by the same management, are complying with the law.

I hereby authorize the Texas Attorney General's Office and any of its representatives to use this declaration in this bankruptcy proceeding.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 14, 2022 in Austin, Texas.

/s Joseph Jason Rotunda
By: Joseph Jason Rotunda

**FTX's offer and sale of FTT Tokens, which are unregistered securities.**

182.     The FTT token that contributed to FTX's demise is also an investment contract per the *Howey* Test. FTT is an exchange token created by FTX that entitles holders to benefits on the FTX exchange. According to crypto news site CoinDesk, "such benefits often include trading fee

discounts, rebates and early access to token sales held on the platform."[92] Exchange tokens can be very profitable for their issuers because the exchanges that issue them tend to keep a significant number of tokens for themselves, which they can pump in price through speeches, social media posts, and other announcements. Economically, exchange tokes are akin to equity, although the holders of exchange tokens have no legal rights or interests in the issuer. As the exchange issuer grows in size and prominence, and trading volume increases on the exchange, the value of the exchange token will likely increase. Thus, the value of FTT increased as the FTX exchange became more well-known and utilized.[93]

183.   FTT passes the *Howey* Test because the token was controlled by FTX; the company could create or destroy FTT at will. And the value of FTT was based upon the success of FTX, therefore the "efforts" of others prong of the Howey Test is implicated. It is also clear that investors bought FTT because they thought it would go up in price; this is the same reason why most, if not all, investors buy any given cryptocurrency. In fact, Binance CEO Changpeng "CZ" Zhao agreed to accept FTT tokens as part of FTX's buyout of Binance's equity stake in FTX.[94] Exchange tokens like FTT also functionally resemble the XRP token, which the SEC alleges is an investment contract due to Ripple's control over the XRP token.[95]

**Using the Deceptive FTX Platform itself necessarily required transacting in unregistered securities.**

184.   Another avenue through which FTX users may have been exposed to a securities transaction was through the basic structure of the Deceptive FTX Platform.

---

[92] https://www.coindesk.com/learn/what-is-an-exchange-token/ (accessed May 11, 2023).

[93] See FTT price history here: https://coinmarketcap.com/currencies/ftx-token/ (accessed May 11, 2023).

[94] https://www.investors.com/news/binance-to-buy-ftx-international-operations-as-liquidity-crunch-sparks-crypto-selloff/ (accessed May 11, 2023).

[95] https://www.sec.gov/news/press-release/2020-338 (accessed May 11, 2023).

185. Despite cryptocurrency and blockchain's foundational premise being the ability to transmit value peer-to-peer using a trustless and decentralized database that cannot be censured by any third party, cryptocurrency exchanges operate more like traditional banks.

186. When you buy Bitcoin through a centralized cryptocurrency exchange, there is no corresponding transaction to the Bitcoin blockchain. Rather, the exchange simply maintains its own database that indicates which cryptocurrencies it owes to its customers. This is similar to how banks operate. Money deposited in a checking account is not actually "ours." The money becomes the bank's and we are owed a debt by the bank which is governed by the terms and conditions of the account.

187. Cryptocurrency exchanges should then be in custody of enough cryptocurrency on the blockchain to cover what it owes customers. Custody can be done using hot or cold digital wallets (hot wallets are connected to the internet, cold wallets are not) with best practice being for exchanges to hold the majority of cryptocurrency (crypto which they are holding on behalf of customers) in multiple cold wallets. Best practice would also dictate that exchanges hold customer assets in separate wallets from exchange assets, and that each customer's assets would be held in a distinct wallet.

188. According to the first day declaration by John Ray, FTX kept its crypto in a common pool used to fund undisclosed and unreasonably risky investments:

> The FTX Group did not keep appropriate books and records, or security controls, with respect to its digital assets. Mr. Bankman-Fried and [Alameda co-founder Gary] Wang controlled access to digital assets of the main businesses in the FTX Group (with the exception of LedgerX, regulated by the CFTC, and certain other regulated and/or licensed subsidiaries). Unacceptable management practices included the use of an unsecured group email account as the root user to access confidential private keys and critically sensitive data for the FTX Group companies around the world, the absence of daily reconciliation of positions on the blockchain, the use of software to conceal the misuse of customer funds, the secret exemption of Alameda from certain aspects of FTX.com's auto-liquidation protocol, and the absence of independent governance as between Alameda (owned 90% by Mr. Bankman-Fried and 10% by Mr. Wang) and the Dotcom Silo (in which third parties had invested).

> The Debtors have located and secured only a fraction of the digital assets of the FTX Group that they hope to recover in these Chapter 11 Cases. The Debtors have

secured in new cold wallets approximately $740 million of cryptocurrency that the Debtors believe is attributable to either the WRS, Alameda and/or Dotcom Silos. The Debtors have not yet been able to determine how much of this cryptocurrency is allocable to each Silo, or even if such an allocation can be determined. These balances exclude cryptocurrency not currently under the Debtors' control as a result of (a) at least $372 million of unauthorized transfers initiated on the Petition Date, during which time the Debtors immediately began moving cryptocurrency into cold storage to mitigate the risk to the remaining cryptocurrency that was accessible at the time, (b) the dilutive 'minting' of approximately $300 million in FTT tokens by an unauthorized source after the Petition Date and (c) the failure of the co-founders and potentially others to identify additional wallets believed to contain Debtor assets.[96]

189.   In the declaration, Mr. Ray presents several rough balance sheets for the various FTX silos, while noting that he does not have confidence in them, and that "the information therein may not be correct as of the date stated."[97] Most telling is a footnote that appears on the balance sheets for the exchange businesses: "Customer custodial fund assets are comprised of fiat customer deposit balances. Balances of customer crypto assets deposited are not presented."[98] Ray notes that U.S. and overseas exchanges "may have significant liabilities" but that "such liabilities are not reflected in the financial statements prepared while these companies were under the control of Mr. Bankman-Fried."[99]

190.   To further complicate matters, recent statements given by Sam Bankman-Fried to the Wall Street Journal (WSJ) suggest that about half of the balance owed by Alameda to FTX was from wire transfers that customers made to FTX via Alameda in the early days before FTX had a bank account.[100] This money was intended to fund customers' accounts at FTX. Bankman-

---

[96] 042020648197.pdf (pacer-documents.s3.amazonaws.com) (accessed May 11, 2023).

[97] *Id.*

[98] *Id.*

[99] *Id.*

[100] https://www.wsj.com/articles/ftx-founder-sam-bankman-fried-says-he-cant-account-for-billions-sent-to-alameda-11670107659?st=g35ia0eu0bjwqzn&reflink=desktopwebshare_permalink (accessed May 11, 2023).

Fried claims some customers continued to use that route after FTX had a bank account and that over time, "FTX customers deposited more than $5 billion in those Alameda accounts."[101] The WSJ acknowledged that these funds "could have been recorded in two places—both as FTX customer funds and as part of Alameda's trading positions" and that "such double-counting would have created a huge hole in FTX's and Alameda's balance sheets, with assets that weren't really there."[102]

191.    The relationship between FTX and Alameda was critical to the exchange's eventual collapse. After suffering large losses in the wake of several high profile crypto-firm failures in the spring and summer of 2022 (Alameda most likely was exposed to crypto hedge fund Three Arrows Capital), FTX.com lent out some of its customer assets that it did control to Alameda.[103] Presumably, the exchange benefitted from the interest paid by Alameda for the loaned cryptoassets – although some have suggested that the loans were made for free.[104] Alameda could then use the customer assets as cheap collateral for margined trades with other parties (obtaining collateral from other sources would have been much more expensive).[105]

192.    It appears that Alameda did post collateral to secure the loans of customer cryptoassets that it received, but that collateral took the form of FTT tokens. FTT tokens were the so-called "native token" of the FTX exchange: FTX created FTT and issued it to both institutional and retail investors without registering with any regulator or undergoing any audit or other external due diligence. FTX could create unlimited amounts of FTT if it wished.

---

[101] FTX customers deposited more than $5 billion in those Alameda accounts.

[102] *Id.*

[103]  https://newsletter.mollywhite.net/p/the-ftx-collapse-the-latest-revelations   (accessed May 11, 2023).

[104]  https://www.cnbc.com/2022/11/13/sam-bankman-frieds-alameda-quietly-used-ftx-customer-funds-without-raising-alarm-bells-say-sources.html (accessed May 11, 2023).

[105] For a more general discussion of the conflicts of interest inherent in these relationships, see  https://www.coppolacomment.com/2022/11/the-ftx-alameda-nexus.html (accessed May 11, 2023).

193.     In short, there appear to have been two sets of leveraged transactions involved. First, Alameda borrowed assets from FTX's customers, providing FTT tokens as collateral for those loans. Second, Alameda engaged in margin trading, essentially borrowing money to execute risky trading strategies: these trades were secured by the assets Alameda had borrowed from FTX customers' accounts. Leverage makes trades potentially more lucrative, but also makes them more vulnerable to adverse market movements. In an Alameda balance sheet linked to CoinDesk in early November, Alameda's largest asset holdings were listed as being FTT tokens (it is possible that it received these in a kind of bailout from FTX). Other assets listed on that balance sheet included SOL tokens (issued by the Solana blockchain, in which Sam Bankman-Fried was an early investor) and SRM tokens (issued by the Serum exchange that Sam Bankman-Fried co-founded).[106] Alameda had few assets that hadn't been created out of thin air by FTX or FTX-related entities.

## F.  The Defendants Aggressively Marketed the FTX Platform

194.     From its inception, cryptocurrency has been fueled by illicit activity and the crypto sector continues to be rife with frauds and scams. For a detailed breakdown on the illicit use of cryptocurrency, see the U.S. Department of Justice's report from September 2022 titled: "The Role of Law Enforcement In Detecting, Investigation, And Prosecuting Criminal Activity Related to Digital Assets."[107] The report was issued pursuant to the March 9, 2022 Executive Order on Ensuring Responsible Development of Digital Assets and is the latest report on cryptocurrency released by DoJ dating back to 2018, all of which detail the dire harms caused by cryptocurrency. DoJ notes that "[t]he rise of the Bitcoin network paralleled the development of Silk Road, AlphaBay, and other illegal online marketplaces…" and the department classified digital asset crime into three categories: "(1) cryptocurrency as a means of payment for, or manner of

---

[106]     https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/ (accessed May 11, 2023).

[107]     https://www.justice.gov/opa/pr/justice-department-announces-report-digital-assets-and-launches-nationwide-network (accessed May 11, 2023).

facilitating, criminal activity; (2) the use of digital assets as a means of concealing illicit financial activity; and (3) crimes involving or affecting the digital assets ecosystem." The September report details several high-profile cases involving the illicit use of cryptocurrency. One case is the darknet marketplace Silk Road, which accepted payment only in Bitcoin, and was shut down by the FBI in 2013 after having facilitated sales revenue totaling over 9.5 million Bitcoin, equivalent to roughly $1.2 billion at the time.[108]

195.    Cryptocurrency is increasingly being used by organized crime syndicates and nation states for illicit purposes. In January 2022, the Government Accountability Office (GAO) issued a report finding that "[v]irtual currency is increasingly used illicitly to facilitate human and drug trafficking."[109] Cryptocurrency is also being used by Iran, Russia, and North Korea to bypass U.S. economic and financial sanctions.[110] According to the United Nations, "money raised by North Korea's criminal cyber operations are helping to fund the country's illicit ballistic missile and nuclear programs."[111] North Korea's brazenness was revealed to the public earlier this year when a well-known "Web 3" video game, Axie Infinity, was hacked and $620 million in the cryptocurrency ether was stolen. "Chainalysis estimates that North Korea stole approximately $1 billion in the first nine months of 2022 from decentralized crypto exchanges alone," one of the reasons why Anne Neuberger, US deputy national security adviser for cyber security, said in July

---

[108]https://web.archive.org/web/20140220003018/https://www.cs.columbia.edu/~smb/UlbrichtCriminalComplaint.pdf (accessed May 11, 2023).

[109] Virtual Currencies: Additional Information Could Improve Federal Agency Efforts to Counter Human and Drug Trafficking [Reissued with Revisions Feb. 7, 2022] | U.S. GAO (accessed May 11, 2023).

[110] Russia Could Use Cryptocurrency to Mitigate U.S. Sanctions - The New York Times (nytimes.com) (accessed May 11, 2023), Iran Plans Uses Crypto for Imports to Get Around Sanctions (gizmodo.com) (accessed May 11, 2023), This is how North Korea uses cutting-edge crypto money laundering to steal millions | MIT Technology Review(accessed May 11, 2023).

[111] How North Korea became a mastermind of crypto cybercrime | Ars Technica (accessed May 11, 2023).

1    2022 that North Korea "uses cyber to gain …. up to a third of their funds for their missile

2    program."[112]

3        196.    Cryptocurrency has also fueled a surge in ransomware that has victimized

4    American businesses, health care systems, and state and local governments. In May of 2022, the

5    majority staff on the Homeland Security & Governmental Affairs Committee released a startling

6    report on ransomware.[113] The report notes that in 2021, "ransomware attacks impacted at least

7    2,323 local governments, schools, and healthcare providers in the United States" and that the FBI

8    "received 3,729 ransomware complaints with adjusted losses of more than $49.2 million." The

9    report acknowledges that these numbers underestimate the true scale of the problem because many

10   ransomware victims do not report to authorities. As evidence, they cite data from blockchain

11   analytics company Chainalysis that found "malign actors received at least $692 million in

12   cryptocurrency extorted as part of ransomware attacks" in 2020. The report notes that

13   "cryptocurrency, typically Bitcoin, has become a near universal form of ransom payment in

14   ransomware attacks, in part, because cryptocurrency enables criminals to extort huge sums of

15   money from victims across diverse sectors with incredible speed." The link between

16   cryptocurrency and ransomware became clear to the public in the wake of the Colonial Pipeline

17   hack in May 2021, which disrupted gasoline supplies in the southeastern U.S. In the wake of that

18   breach, several commentators argued for a ban, or heavy regulation, of cryptocurrency.[114]

19       197.    Everyday consumers have also fallen victim to various cryptocurrency-related

20   scams. The Consumer Financial Protection Bureau (CFPB) published 2,404 cryptocurrency related

21   consumer complaints in its Consumer Complaint Database during 2021, and more than 1,000

22

23

24   _____

25       [112] Id.

26       [113] HSGAC Majority Cryptocurrency Ransomware Report.pdf (senate.gov) (accessed May
     11, 2023).

27       [114] Ban Cryptocurrency to Fight Ransomware - WSJ (accessed May 11, 2023).

28

cryptocurrency-related complaints during 2022 year-to-date.[115] According to the September DoJ report: "The CFPB has also received hundreds of servicemember complaints involving cryptocurrency assets or exchanges in the last 12 months, approximately one-third of which concerned frauds or scams."[116] In June 2022, the Federal Trade Commission issued a report finding that "since the start of 2021 more than 46,000 people have reported losing over $1 billion in crypto to scams – that's about one out of every four dollars reported lost, more than *any* other payment method."[117] The median individual loss was a staggering $2,600.

198.    Another September 2022 report from the Treasury Department, issued pursuant to the Executive Order, also called out the risks and harms to consumers from cryptocurrency:

> "Consumers and investors are exposed to improper conduct in the crypto-asset ecosystem for a variety of reasons, including a lack of transparency as well as the fact that crypto-assets have relatively novel and rapidly developing applications. This leads to frequent instances of operational failures, market manipulation, frauds, thefts, and scams. While the data for populations vulnerable to disparate impacts remains limited, available evidence suggests that crypto-asset products may present heightened risks to these groups, and the potential financial inclusion benefits of crypto-assets largely have yet to materialize."[118]

199.    There is also a long history of consumer losses associated with centralized exchanges, FTX being the latest. One of the first cryptocurrency exchange failures was Japan-based Mt. Gox in 2014. Mt. Gox was handling over 70% of bitcoin transactions worldwide by the time it ceased operations after the exchange was hacked and the majority of cryptocurrency held by the exchange on behalf of customers was stolen. Creditors to Mt. Gox are still waiting for their

---

[115] Justice Department Announces Report on Digital Assets and Launches Nationwide Network | OPA | Department of Justice (accessed May 11, 2023).

[116] *Id.*

[117] Reports show scammers cashing in on crypto craze | Federal Trade Commission (ftc.gov) (accessed May 11, 2023).

[118] Crypto-Assets: Implications for Consumers, Investors, and Businesses (treasury.gov) (accessed May 11, 2023).

CLASS ACTION COMPLAINT

funds, a sign that does not bode well for FTX creditors, to the extent they seek recovery directly from the FTX Group through the bankruptcy proceedings.[119]

200.    All of the above-mentioned problems with cryptocurrency are well known and one of the big reasons why consumers are hesitant to purchase or use cryptocurrency. According to Pew Research, 16% of Americans have invested in cryptocurrency while another 71% are not invested although they have heard at least a little about cryptocurrency.[120] For those in the latter group, concerns around fraud and scams are likely playing a role in their resistance to crypto investing.

201.    These valid concerns are one reason why crypto firms like FTX turn to celebrity endorsers. The FTX advertising campaign is particularly pernicious because it implicitly acknowledges cryptocurrency's problems while holding FTX out as the "safe" place to invest in cryptocurrency (note statements by Curry, below). These statements were untrue, as FTX turned out to be a house of cards that misappropriated customer assets.

202.    FTX's paid endorser program was clearly designed to use the positive reputation associated with specific celebrities to convince consumers that FTX was a safe place to buy and sell cryptocurrency.

203.    As Mr. Sibenik explains, FTX's brand ambassadors and ad campaigns that utilized those brand ambassadors had a critical role in portraying FTX as being 'safe' and 'compliant.' Ex. D ¶ 44–49:

> In Stephen Curry's FTX commercial, FTX's alleged safety is quite blatant stated when he claims
>
> *"With FTX, I have everything I need to buy, sell, and trade crypto safely"*

---

[119] What to Watch in the FTX Bankruptcy as Details Remain Scarce - WSJ

[120] 46% of cryptocurrency investors in US say it did worse than expected | Pew Research Center

CLASS ACTION COMPLAINT

204.     Other organizations and individuals, with presumably more to gain, did find red flags at FTX and turned down FTX and/or Sam Bankman-Fried's money. The nonprofits Our World Data and MITRE declined offered gifts of $7.5 million and $485,000, respectively, from the FTX Future Fund due to undisclosed red flags.[121] In addition, CME Group CEO Terry Duffy allegedly told Sam Bankman-Fried that he was "an absolute fraud" upon having an initial conversation with Mr. Fried.[122] Finally, after FTX's implosion, the FT reported that FTX held talks with Taylor Swift to sponsor the singer's tour for more than $100 million.[123] While the article does not detail the reasons why Swift declined the FTX offer, it does include the following quote from a person close to the negotiations:

> "Taylor would not, and did not, agree to an endorsement deal. The discussion was around a potential tour sponsorship that did not happen."[124]

205.     Subsequent reports indicate that Taylor Swift's team had inquired about whether FTX was selling unregistered securities, and did not receive a satisfactory answer.

206.     Based upon the information that has been released by FTX's new CEO John Ray as part of the company's bankruptcy filings, it is clear that anyone who bothered to spend 20 minutes reviewing FTX's operations pre-collapse would have identified significant red flags. In his first day pleading in support of FTX's chapter 11 petitions, Mr. Ray noted:

> "Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced,

[121] https://www.moneyweb.co.za/moneyweb-crypto/sam-bankman-frieds-red-flags-were-seen-in-all-corners-of-his-empire/ (accessed May 11, 2023).

[122]     https://www.cnbc.com/2022/11/23/absolute-fraud-cmes-terry-duffy-says-he-saw-trouble-before-ftx-collapse-.html (accessed May 11, 2023).

[123] FTX held talks with Taylor Swift over $100mn sponsorship deal | Financial Times (accessed May 11, 2023).

[124] Id.

CLASS ACTION COMPLAINT

unsophisticated and potentially compromised individuals, this situation is unprecedented."[125]

207.    Mr. Ray's pleading contains a number of troubling findings, among them: 1.) FTX did not have centralized control of its cash, 2.) FTX had no dedicated human resources department, which has hindered Mr. Ray's team from preparing a complete list of who worked for the FTX Group, 3.) A lack of disbursement controls that resulted in employees submitting payment requests via on-line chat and these requests being approved by managers responding with personalized emojis, 4.) Corporate funds were used to purchase homes and personal items for employees, and 5.) A lack of books and records and the absence of lasting records of decision-making.

208.    It is hard to imagine that anyone who has done business with FTX, including paid endorsers, would not have personally witnessed one or more of the deficiencies identified by Mr. Ray. All FTX endorsers have extensive business dealings beyond FTX and surely would be able to identify business practices that are unusually problematic. Of course, the same can be said for prominent venture capital (VC) firms that invested in FTX. But these investors are in the business of taking risk and VC firms have an incentive to conduct limited due diligence lest they become known as unfriendly to founders and get locked out of future deals. The same "founder friendly" dynamics played a role in lapse due diligence at WeWork and Theranos.

209.    Furthermore, many customers were not opting to use FTX because of who their investors were. Instead, many customers relied on the testimonials of paid celebrity endorsers and these celebrities knew why they were being compensated. Indeed, the whole point behind paying celebrities to endorse a product is to increase sales.

---

[125] https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&ved=2ahUKEwiokr3C_-L7AhWsnGoFHRdBC2kQFnoECBAQAQ&url=https%3A%2F%2Fpacer-documents.s3.amazonaws.com%2F33%2F188450%2F042020648197.pdf&usg=AOvVaw38wQJwnmP5fFftiyYkNjSG (accessed May 11, 2023).

210.    Thus, celebrities like the Brand Ambassador Defendants have a moral and legal obligation to know that what they are promoting is unlikely to cause physical or financial damage to customers.

211.    In addition to the conduct of Sam Bankman-Fried, as described in this Complaint, some of the biggest names in sports and entertainment have either invested in FTX or been brand ambassadors for the company. A number of them hyped FTX to their social media fans, driving retail consumer adoption of the Deceptive FTX Platform.

212.    In March 2021, FTX became the first company in the crypto industry to name an arena. This helped lend credibility and recognition to the FTX brand and gave the massive fanbase of basketball exposure to the Deceptive FTX Platform.

213.    FTX's explanation for using stars like Curry was no secret. "We're the newcomers to the scene," said then-FTX.US President Brett Harrison, referring to the crypto services landscape in the U.S. "The company needs to familiarize consumers with its technology, customer service and offerings, while competing with incumbents like Coinbase Global Inc. or Kraken," Mr. Harrison said. "We know that we had to embark on some kind of mass branding, advertising, sponsorship type work in order to be able to do that," he said.[126]

214.    In other words, the FTX Group needed celebrities like Defendants to continue funneling investors into the FTX Ponzi scheme, and to promote and substantially assist in the sale of the YBAs, which are unregistered securities. Below are representative statements and advertisements Defendants made to drive the offers and/or sales of the YBAs, which Plaintiff and Class Members will supplement as the case progresses and discovery unfolds.

215.    The promotions should not be viewed in isolation, but rather as a part of a wide-ranging conspiracy to promote and sell unregistered securities, and to aid and abet the FTX Group's fraud and conversion perpetrated on Plaintiffs and the Classes.

---

[126]    https://www.wsj.com/articles/tom-brady-and-gisele-bundchen-to-star-in-20-million-campaign-for-crypto-exchange-11631116800?mod=article_inline (accessed May 11, 2023).

216.    On or around September 10, 2021, FTX tweeted out a list of its promoters who were part of the "You In?" campaign, asking its audience whether they are "in" as well.

### i.    **Defendant Steph Curry**



217.    Steph Curry is an American professional basketball player for the Golden State Warriors of the NBA. He is widely regarded as one of the greatest basketball players of all time and the greatest shooter in NBA history. This perennial All-Star has been named the NBA Most Valuable Player twice, won four NBA championships, and received an NBA Finals MVP Award.

### a.    **Steph Curry Partnered with FTX to Promote Its Platform.**

218.    On or about September 7, 2021, FTX partnered with Curry as a brand ambassador, through his company SC30 Inc., to provide FTX with spokesperson and marketing services. Those services included but were not limited to posting on social media, creating an exclusive NFT collection, and appearing in commercial advertising.

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18



219.    The overarching objective of the partnership was for Mr. Curry, through a series of promotions and media campaigns, to help FTX successfully solicit or attempt to solicit investors in FTX's crypto-related securities from Florida and nationwide.

220.    In exchange for his services, Mr. Curry received a substantial total compensation package, including an equity stake in FTX.[127] Because of his compensation structure, the more

---

[127] https://www.goldenstateofmind.com/2022/11/17/23453998/curry-dressed-like-mime-no-reason; https://www.cbssports.com/nfl/news/ftx-collapse-tom-brady-stephen-curry-shohei-ohtani-among-sports-figures-named-in-class-action-lawsuit/

CLASS ACTION COMPLAINT

success that Mr. Curry had in influencing consumers to make investments on the FTX platform, the more Mr. Curry stood to profit financially.

221.    FTX's renaming of the "FTX Arena" in 2021 in Downtown Miami for the NBA franchise the Miami Heat served as an important centerpiece for FTX's efforts to form partnerships with other celebrities such as Mr. Curry.

222.    FTX's senior executive responsible for creating, consummating, and implementing deals between FTX and Mr. Curry was Avinash Dabir, who originally worked for Blockfolio, which FTX later acquired, and eventually became FTX's Vice President of Business Development.

223.    Since early 2021, FTX maintained an office in Miami that was run by Mr. Dabir, who operated from our Miami office to formulate and execute FTX's important celebrity partnerships, including the partnership with Mr. Curry.

224.    On information and belief, the negotiation and execution of Mr. Curry's agreement with FTX involved communications between Mr. Curry or his authorized representatives (including representatives of his company SC30 Inc.) and Mr. Dabir in FTX's offices in Miami. On information in belief, Mr. Curry understood the counterparty to his contractual negotiations based its domestic operations in Florida.

225.    Mr. Curry also directly or indirectly transacts business in Florida through his company SC30 Agency LLC (in which Mr. Curry is a member through his family trust), which is a Delaware company with the same principal address as SC30 Inc. in California. But Mr. Curry's company SC30 Agency LLC is registered to do business in Florida and maintains an authorized agent in Plantation, Florida.

   **b.  Curry Engaged in a Sustained and Aggressive Promotion and Advertising Campaign.**

226.    Curry partnered with FTX and provided services in accordance with his agreement, and in keeping with his own interests as an owner of an equity stake in FTX. For example, Curry posted on social media and appeared in images and videos used to promote FTX.

227.   Curry made numerous statements across platforms to induce individuals to invest in the Deceptive FTX Platform and obtain YBAs and/or FTT.

228.   Curry did not disclose the form or amount of payments received under his agreement to the public when promoting FTX.

229.   The purpose of Curry being an ambassador was to expand the reach of the crypto firm and "tout the viability of cryptocurrency to new audiences around the world," as FTX said in a press release.128 In other words, to drive adoption of the Deceptive FTX Platform and to facilitate the sales of the unregistered Deceptive FTX Platform, YBAs and/or FTT to unsuspecting and unwitting retail consumers.

230.   "I'm excited to partner with a company that demystifies the crypto space and eliminates the intimidation factor for first-time users," Curry said in a statement, highlighting that "first-time," inexperienced users were among the intended targets of the campaign.129

231.   Curry's foundation, Eat.Learn.Play. also partnered with FTX on charitable initiatives.130

232.   Additional examples of Curry's specific promotions of FTX follow:

233.   Starting on or about March of 2022, Curry had his own nationwide ad campaign pushing the Deceptive FTX Platform, known as the "#notanexpert" campaign.131 Throughout the ad, Curry repeatedly denies being cast as an expert in cryptocurrency, culminating in his statement

---

128   https://www.prnewswire.com/news-releases/nba-superstar-stephen-curry-becomes-global-ambassador-and-shareholder-of-leading-cryptocurrency-exchange-ftx-through-long-term-partnership-301370497.html (accessed May 11, 2023).

129 *Id.*

130 *Id.*; https://fortune.com/2021/09/07/nba-steph-curry-ftx-deal-cryptocurrency-platform/

131   https://www.youtube.com/watch?v=gsy2N-XI04o   (accessed   May   11,   2023).
https://twitter.com/FTX_Official/status/1508881676436492291

that "I'm not an expert, **and I don't need to be.** With FTX I have everything I need to buy, sell, and trade crypto **_safely._**"[132]

234.    As Mr. Curry expected and understood when entered his partnership with FTX, his advertisements were widely viewed nationwide, including in Florida, where Mr. Curry knew or should have known FTX had its domestic home office (including because the arena of NBA's Miami Heat had been renamed "FTX Arena" long before Mr. Curry's FTX promotion campaign).

235.    On information and belief, Mr. Curry also knew and anticipated that his promotions would be disseminated to consumers in Florida and elsewhere not just on FTX's official social media outlets (where some promotional materials are still accessible: https://twitter.com/FTX_Official/status/1508881676436492291), but that said promotions would also be linked, published, or reposted across innumerable media outlets on the internet and elsewhere.



---

[132] *Id.*

236.    Mr. Curry also knew or should have known that the more views, clicks, and exposure generated by his promotions about FTX, the more consumers would be influenced to invest in FTX's crypto-related securities.

237.    Curry also had his own line of NFTs that were only accessible via FTX. Dubbed the "2974 Collection," he partnered with the company to mint 2,974 unique images celebrating each of his career three-pointers up to the date he broke the NBA's all-time record for scoring threes. The NFTs were sold for $499 a piece with all proceeds going to his charitable foundation.

238.    On or about December 20, 2021, Curry announced his first NFT collection exclusively available on the FTX platform. The co-branding promotion was intended to drive traffic to FTX and thereby generate consumer investments in FTX crypto-securities. But while Mr. Curry indicated that sale of "unique art pieces" was solely motivated by charity and "[a]ll profits to charity," he failed to disclose that, based on his own compensation package from FTX, he also stood to financially profit from this and other promotions by driving FTX's business.



CLASS ACTION COMPLAINT

239.     On or about March 15, 2022, Curry posted a tweet teasing a special promotion for holders of his exclusive FTX NFTs.



240.     Curry had merchandising tie-ins with his FTX exclusive NFTs. On or about June 10, 2022, during his NBA Finals Game 4 entrance, Curry unveiled merchandise that was available exclusively to Curry's 2974 Collection NFT holders. This initiative promised to offer collection holders unique and one-of-a-kind experiences that connect them with Curry. To purchase the gear, customers had to hold their 2974 Collection NFTs in an FTX digital wallet.[133]

---

[133]     https://thesource.com/2022/06/11/stephen-curry-drops-surprise-2974-merch-during-nba-finals-game-24/

CLASS ACTION COMPLAINT

241.    The 2974 Collection NFT has produced over $4.4 Million in trading volume on the FTX.US NFT platform and distributed over 100 NFT memorabilia giveaways.[134]

242.    In addition to these initiatives, as part of the promotional partnership Mr. Curry placed his brand and public image behind FTX to boost FTX's profile.

243.    On or about October 19, 2021, FTX tweeted a post celebrating the start of the NBA regular season, tagged Curry, and included the original announcement video for the partnership between FTX and Mr. Curry.



_____

[134] *Id.*

87
CLASS ACTION COMPLAINT

244.    On or about December 14, 2021, FTX tweeted a congratulations at Curry for the latter's accomplishment of becoming the all-time three-point scorer in NBA history.



245.    On or about June 16, 2022, FTX tweeted a congratulations at Curry and the Golden State Warriors for winning the 2022 NBA championship.



246.    Mr. Curry also amplified and "signal boosted" many stand-alone FTX tweets by replying to the posts. In practical effect, this disseminated the FTX posts to the tens of millions of people who follow Mr. Curry's social media activity. These seemingly "natural" promotions by Mr. Curry do not have the same formality of standard advertising, and in some respects, they are more insidious.

247.    For example, on or about February 13, 2022, Mr. Curry tweeted interest in participating in the Bitcoin giveaway connected to FTX's 2022 Super Bowl commercial.



248.    Despite being orchestrated to appear to ordinary consumers as a genuine and non-commercial expression of support by Mr. Curry that "This [FTX sweepstakes] dope! But can I

enter though?" (adding several emojis), in fact, these campaigns were carefully orchestrated and contractually required. Mr. Curry was being compensated for his participation, like a planted audience member in a magic show. In fact, these particular FTX promotions coincided with Mr. Curry's attendance at the Super Bowl Championship in Los Angeles, whose broadcast was partly sponsored by a multi-million dollar FTX promotional campaign featuring Larry David, which was the centerpiece of FTX's promotional blitz tied to the game.

249.    On or about December 3, 2021, Curry replied to an announcement from FTX regarding the listing of Ethereum NFTs. His reply references the fact that he edited the announcement video for his partnership with FTX.



CLASS ACTION COMPLAINT

250.    With respect to Mr. Curry's promotional activity and social media comments on this date and numerous other dates, Plaintiff has not yet been able to discover facts bearing on the contacts between Mr. Curry (directly or through his agents) and FTX's employees in Florida for purposes of receiving instructions or scripts for these promotions.

251.    Curry also replied to posts announcing other celebrity promotions and collaborations. On or about Oct 27, 2021, Curry welcomed David Ortiz, using his nickname "Big Papi," into the FTX promotional "family."



252.    On or about June 4, 2021, Curry replied to the announcement of the partnership between FTX and the e-sports team TSM.

CLASS ACTION COMPLAINT



c. **Curry Had Financial Incentives to Induce Class Members to Invest in FTX and to Trust the Platform.**

253.    As a global ambassador and shareholder of FTX,[135] Curry had a financial incentive to induce Plaintiffs to invest with FTX. Curry was paid, at least in part, in FTX stock and/or stock options – the value of which depended on the financial success of FTX.[136]

254.    Further, Curry had every incentive to be an effective promoter of FTX to continue the ambassador relationship, continue receiving payment for his services, and continue supporting his philanthropic activities which partnered with FTX.

d. **The Promotions Were Deceptive and Unlawful.**

255.    Mr. Curry and FTX launched a commercial campaign designed to bring cryptocurrency and investing in the Deceptive FTX Platform, including YBAs and/or FTT, to the masses. Mr. Curry did not properly disclose that he was being compensated by the entity offering

---

[135] https://twitter.com/FTX_Official/status/1435398083140018182

[136] https://www.goldenstateofmind.com/2022/11/17/23453998/curry-dressed-like-mime-no-reason; https://www.cbssports.com/nfl/news/ftx-collapse-tom-brady-stephen-curry-shohei-ohtani-among-sports-figures-named-in-class-action-lawsuit/

CLASS ACTION COMPLAINT

and selling the security, and in some instances, on information and belief he intentionally disguised or downplayed the fact he was being paid for promoting FTX.

256.   Curry made deceptive statements in his promotions, including statements like, "With FTX I have everything I need to buy, sell, and trade crypto safely."

**e.   Curry Knew or Should Have Known He was Soliciting or Assisting FTX to Solicit Investments in Unregistered Securities and/or that He was aiding and abetting FTX Group's fraud and/or conversion.**

257.   Given Curry's substantial investment experience (through his investment arm SC30) and vast resources to obtain outside advisors (which he had), he knew or should have known of potential concerns about FTX selling unregistered crypto securities and/or that he was aiding and abetting FTX Group's fraud and/or conversion, especially to millions of his loyal followers and fans. When Curry engaged in the promotions, the legal risks of promoting investments in cryptocurrency trading platforms were well known. This is especially true in light of the rampant mismanagement and myriad red flags that the FTX Group's regular business practices set off, as more fully described hereinabove.

**f.   The Promotions Were Directed at Plaintiffs in Florida, and Customers Nationwide.**

258.   Curry's promotions were published on public social media accounts accessible to plaintiffs nationwide, including in Florida.

259.   Curry, as a nationally known and famous professional basketball player, has considerable influence on basketball fans nationwide and has a wide social media following, further allowing him to direct his unlawful promotions towards plaintiffs in Florida and nationwide.

260.   Curry also provided spokesperson services while playing for the Golden State Warriors, including while playing against teams from Florida at home in California, and while playing against Florida teams in Florida, including but not limited to December 6, 2021, against Orlando in San Francisco; January 3, 2022, against Miami in San Francisco; October 27, 2022,

against Miami in San Francisco; November 1, 2022, against Miami in Miami; November 3, 2022, against Orlando in Orlando.

261.     Mr. Curry has further contacts with Florida and, on information believe, has engaged in business activity in Florida through SC30 Agency LLC, which is a Delaware company that shares the same principal address as Mr. Curry's company SC30, Inc. and is authorized to transact business in Florida. SC30 Agency LLC has a registered agent located in Plantation, Florida.

**ii.     Defendant Golden State Warriors**



Official Crypto Platform and NFT Marketplace
of the **Golden State Warriors**

262.     The Golden State Warriors (the "Warriors") are an American professional basketball team in the NBA and based in San Francisco, California. The team plays its home games at the Chase Center. They have won four NBA championship titles in the last decade and are one of the most recognizable NBA teams in the league.

**a.   The Warriors Partnered with FTX to Promote Its Platform.**

263.     On or around December 14, 2021, the Warriors and FTX announced a first-of-its-kind cryptocurrency partnership in professional sports, with the unveiling of the FTX logo on the court at the Chase Center. As the Warriors' Official Cryptocurrency Platform and NFT

Marketplace, the franchise announced it would drop NFTs on FTX.US, beginning in early 2022. The partnership between the Warriors and FTX was the first international rights partner for the team, granting both the Warriors and FTX a visible market presence, inclusive of logo and likeness, internationally.[137]

264.    FTX's renaming of the "FTX Arena" in 2021 in Downtown Miami for the NBA franchise the Miami Heat served as an important centerpiece for FTX's efforts to form partnerships with ambassadors like the Warriors.

265.    FTX's senior executive responsible for creating, consummating, and implementing deals between FTX and promotors was Avinash Dabir, who originally worked for Blockfolio, which FTX later acquired, and eventually became FTX's Vice President of Business Development.

266.    Since early 2021, FTX maintained an office in Miami that was run by Mr. Dabir, who operated from our Miami office to formulate and execute FTX's important celebrity partnerships, including the partnership with the Warriors.

267.    On information and belief, the negotiation and execution of the Warriors agreement with FTX involved communications between the Warriors and Mr. Dabir in FTX's offices in Miami. On information in belief, the Warriors understood the counterparty to the contractual negotiations based its domestic operations in Florida.

268.    In announcing the partnership, Warriors President and Chief Operating Officer Brandon Schneider said: "Cryptocurrency has a well-established worldwide community and is going to continue to be a major part of the sports, media and entertainment industries, . . . In our conversations with FTX, we quickly realized our joint desire to innovate around cryptocurrency integration and adoption, including the role NFTs play in global fan engagement."[138]

---

[137] https://www.nba.com/warriors/warriors-ftx-partnership-20211214

[138] *Id.*

269.     The deal also included the Warriors' G League team, the Golden Guardians and Warriors Gaming Squad (affiliated esports teams), in-arena signage at Chase Center, and virtual floor signage at Warriors games.139

270.     The NBA encourages teams to negotiate international sponsorship arrangements and shares in the revenue derived from such partnerships. In the 2021-22 season, the NBA's second largest category of sponsorships came from the crypto industry. NBA teams partnered with, among others, Crypto.com, Webull, Coinbase, FTX and Socios.

271.     The deal terms were not made public, but, upon information and belief, the deal was a multiyear pact valued north of $10 million total.140 The Warriors netted another $2 million from NFT sales.141

### b. The Warriors Engaged in a Sustained and Aggressive Promotion and Advertising Campaign.

272.     The Warriors and FTX launched a partnership designed to bring cryptocurrency and investing in the Deceptive FTX Platform, including YBAs and/or FTT, to the masses of Warriors fans across the country and world.

273.     FTX US President Brett Harrison said at the outset of the partnership: "The FTX US NFT Platform will provide a leading, safe and secure venue for the Warriors international fan base to access exclusive collectables from the franchise. Alongside the NFT drops, working with the Warriors will increase our ability to create a positive change, not only domestically but internationally, with one of the most prestigious professional sport franchises in the world."142

274.     One of the main features of the partnership was the Warriors advertising FTX on their home court and thought the area during home basketball games. These advertisements could

---

139 https://www.instagram.com/p/CYiBaq8JLx7/ (accessed May 11, 2023).

140   https://www.cnbc.com/2021/12/14/ftx-to-pay-golden-state-warriors-10-million-for-global-rights.html

141 *Id.*

142 https://www.nba.com/warriors/warriors-ftx-partnership-20211214

be seen by the fans in the arena and to viewers of the game broadcast. The Warriors offered FTX hours of screen time giving their stamp of approval of FTX to viewers and fans in Texas, Florida, and across the country.

275.    The Warriors also promoted FTX through its social media platforms. On or about May 9, 2022, the Warriors tweeted a promotion for their home playoff game against the Memphis Grizzlies and noted that the game was presented by FTX. These kinds of "presented by" posts were common during the period of the FTX partnership. This promotion also included each fan in attendance receiving an NFT Digital Collectible.



276.    On or about April 12, 2022, the Warriors worked with FTX to offer their own NFT Collection. The Golden State Warriors 2022 Playoff NFT Collection was made up of 3,000 NFTs, featuring 12 unique designs randomly assigned when minted on the blockchain on FTX US, the team's Official NFT Marketplace. The NFT collection was minted exclusively on the FTX US

CLASS ACTION COMPLAINT

NFT marketplace. Each NFT sold for $499.99. Fans must have had a FTX US Account to mint and participate in the 1-of-1 auction. The Playoff NFT is a digital collectible that doubled as an entrance pass into the GSW community on Discord. The NFTs granted fans access to member-only benefits, exclusive Warriors swag and white-list access to future NFT drops.[143]



277.     In connection with the Warriors' NFT offer, the Warriors partnered with Shaquille O'Neal and the Astrals NFT project he founded and developed with his son, Myles O'Neal, to provide O'Neal's followers with exclusive, whitelisted, early access to the Warriors NFT collection when it dropped. As explained in Astrals CEO Brian Bayati's announcement made on the official Astrals Discord channel on April 14, 2022, it was required for investors to have a *funded* FTX account in order to participate in the Warriors' NFT offer and sale:[144]

---

[143]         https://www.nba.com/warriors/news/warriors-ftx-2022-playoff-nft-collection-20220412

[144]         https://discord.com/channels/928105025392214027/928185412961308792/9642895219550044 87 (accessed May 15, 2023).

**The Golden State Warriors 2022 Playoff NFT Collection**

ASTRALS is proud to be the only Solana NFT project to partner with The Warriors on their upcoming NFT collection - The Golden State Warriors 2022 Playoff NFT Collection. After creating the first and most buzzed about NFT of any sports franchise worldwide, the Warriors are returning with the first ever responsive NFT (2999 supply) collection driven by the success of the team's on-court NBA Playoff Performance starting this weekend!

*As an ASTRALS NFT holder, we will be the only community to receive whitelist access granting us early access to the collection TOMORROW at 10AM PST.*

**How To Mint your Golden State Warriors NFT:**
・Join the Golden State Warriors Discord https://discord.com/invite/goldenstatewarriorsnft
・Click the #nft-verification channel
・Connect the wallet you are holding your ASTRALS NFT in to collab land in the GSW discord
・Message in our exclusive, ASTRALS only, #astrals-lounge channel that you just unlocked
・Return to the #astrals-lounge **tomorrow Friday April 15 at 8AM PT** for the reveal of our unique Astrals x Golden State Warriors whitelist code
・At 10AM PST, head to https://bit.ly/GSWNFT_MINTCONFCODE to mint your NFT!
==**NOTE: You must have a verified (KYC) account on FTX US and must have at least $499.99 in USD in your account to mint.**==

We will continue to reveal upcoming MAJOR partnerships (like Authentic Brands Groups & The Golden State Warriors) in the #partnerships channel. @everyone



278.    The next day, the Warriors posted their own official announcement on the Astrals Discord channel, explaining additional terms of the offer to sell their NFTs on the Deceptive FTX Platform, including a link to sign up for the platform as well:[145]

Message from the Golden State Warriors @everyone

**ASTRALS!** We're happy to have you as part of our upcoming Golden State Warriors mint, and love seeing all of the activity in the server. To get everyone ready for the mint tomorrow, we just wanted to clarify a few things that are specific to FTX that may be a bit different than your normal SOL mint process that you're used to.

Whitelist Mint Opens tomorrow Friday April 15 at 10AM PST / 1PM EST

Public Mint Opens tomorrow Friday April 15 at 12PM PST / 3PM EST

 · There is a limit of one mint per txn

 · The whitelist DOES NOT guarantee a mint. You will be receiving early access to the collection, but that does not guarantee a mint, so we do recommend minting as early as possible

 · This is a USD transaction, not SOL. Please make sure you have the funds in your FTX account so you don't miss out.

**How To Mint your Golden State Warriors NFT**: Return to the #astrals-lounge tomorrow Friday April 15 at 8AM PT for the reveal of our unique Astrals x Golden State Warriors whitelist code

At 10AM PST, head to https://bit.ly/GSWNFT_MINTCONFCODE to mint your NFT!

Public mint opens at 12PM PST

NOTE: You must have a verified (KYC) account on FTX US and must have at least $499.99 in USD in your account to mint.

Once you mint, stay tuned for future updates from our team! We will continue to reveal upcoming MAJOR partnerships (like Authentic Brands Groups & The Golden State Warriors) in the #partnerships channel.

---

[145] https://discord.com/channels/928105025392214027/957475748128641084/96439823797492126 8 (accessed May 15, 2023).



279.   The Warriors partnered with FTX to have physical merchandise as well. For example, one of the last FTX-Warriors promotion was a Jordan Poole bobblehead given to the first 10,000 fans at a game against the San Antonio Spurs, on or about November 15, 2022.[146]



---

[146]      https://www.sportsbusinessjournal.com/Daily/Issues/2022/11/15/Marketing-and-Sponsorship/Warriors-stop-FTX-promotions-bankruptcy.aspx

280.    As the Warriors expected and understood when entering its partnership with FTX, the team's promotions would be widely viewed nationwide, including in Florida, where the Warriors knew or should have known FTX had its domestic home office (including because the arena of NBA's Miami Heat had been renamed "FTX Arena").

281.    On information and belief, the Warriors also knew and anticipated that the team's promotions would be disseminated to consumers in Florida and elsewhere not just on FTX's official social media outlets, but that said promotions would also be linked, published, or reposted across innumerable media outlets on the internet and elsewhere.

### c.    The Warriors Had Financial Incentives to Induce Class Members to Invest in FTX and to Trust the Platform.

282.    As an international rights partner of FTX, the Warriors had a financial incentive to induce Plaintiffs to invest with FTX. The Warriors had every incentive to be an effective promoter of FTX to continue the partnership relationship and receive payouts for the successful sale of the Warriors' NFT Collection.

### d.    The Promotions Were Deceptive and Unlawful.

283.    The Warriors did not disclose that they were being compensated by FTX for promoting the sale of unregistered FTX securities.

### e.    The Warriors Knew or Should Have Known They Were Soliciting Or Assisting FTX Solicit Investments In Unregistered Securities and/or that they were aiding and abetting FTX Group's Fraud and/or Conversion.

284.    While negotiating with FTX, the Warriors were on notice of the potential legal compliance risks associated with the promotion and partnership.

285.    The NBA itself warned teams that to enter a sponsorship deal with a cryptocurrency company, the team needed to ensure regulatory compliance of the crypto product, and obtain NBA approval.

286.    To ensure regulatory compliance, at a minimum, the Warriors must have conducted due diligence to understand how FTX was pooling investments in a common enterprise and using those assets to generate the promised returns. Otherwise, it would be impossible to ensure FTX

was not selling or offering to sell securities or perpetrating fraud or conversion on its customers. The Warriors disregarded their obligations to themselves and their fans and went for the money instead.

**f. The Promotions Were Directed at Plaintiffs in Florida, and Customers Nationwide.**

287.   The partnership between the Warriors and FTX included in arena and virtual FTX signage at home NBA games, as well as national promotions through the media and social media. On information and belief, the Warriors knew and intended these promotions would reach people in Florida and nationwide, including because they were displayed at games against Florida teams, which were covered by Florida media.

288.   The Warriors provided promotional services while hosting NBA games against teams from Florida including but not limited to December 6, 2021, against Orlando in San Francisco; January 3, 2022, against Miami in San Francisco; October 27, 2022, against Miami in San Francisco. The broadcasts of these games, with a viewership heavily skewed to Florida, included promotions of FTX.

289.   On or about January 3, 2022, the Warriors hosted the Miami Heat for a regular season NBA game. The national broadcast included FTX promotions on the home Warriors court. In this screengrab Defendant Curry shoots the ball with an FTX logo in the corner of the court. The promotions are also included in any rebroadcast of the game including highlights of the game on YouTube.[147] The YouTube video of the game highlights has been viewed 1.9 million times.

---

[147] https://www.youtube.com/watch?v=_Qi7twvAfts&ab_channel=NBA

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10



11   290.    On or about October 27, 2022, the Warriors hosted the Miami Heat for a regular

12   season NBA game. The national broadcast included FTX promotions on the home Warriors court.

13   In this screengrab Defendant Curry holds the ball with an FTX logo in the corner of the court.[148]

14   The YouTube video of the game highlights has been viewed 2.4 million times.

15
16
17
18
19
20
21
22
23
24



25
26
27

[148] https://www.youtube.com/watch?v=e8tT9QcMzsM&ab_channel=NBA

28

291.    Games against Curry and the Warriors are often some of the most viewed games of the season for visiting team. Fans of Florida teams were more likely to tune in against the high-profile Warriors than almost any other team. Therefore, the Warriors knew and intended to benefit from the attention and viewership of Florida residents whenever they broadcast a game against Florida teams like Miami and Orlando.

## CLASS ACTION ALLEGATIONS

292.    As detailed below in the individual counts, Plaintiffs bring this lawsuit on behalf of themselves and all others similarly situated, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure.

**A.    Class Definitions**

293.    Plaintiffs seek to represent the following Global Classes, if the Court finds Florida's securities statutes apply to all class members, or in the alternative Plaintiffs Kavuri, Gallant, and Nicol seek to represent the following International Classes and Plaintiffs Garrison, Podalsky, Lindeen, and Chernyavsky seek to represent the following Nationwide Classes, if the Court finds Florida's securities statutes apply to all class members, or in the alternative Plaintiffs Garrison, Podalsky, Lindeen, and Chernyavsky seek to represent the following State Subclasses (collectively, "the Classes"), under their respective state laws:

(1) **Global Class I**: All persons and entities who, within the applicable limitations period, purchased or held legal title to any fiat or cryptocurrency deposited or invested through an FTX Platform.

(2) **Global Class II**: All persons and entities who, within the applicable limitations period, purchased or enrolled in a YBA or purchased FTT.

**In the Alternative:**

> **(3)** **International Class I:** All persons or entities residing outside the United States who, within the applicable limitations period, purchased or held legal title to any fiat or cryptocurrency deposited or invested through an FTX Platform.
>
> **(4)** **International Class II:** All persons or entities residing outside the United States who, within the applicable limitations period, purchased or enrolled in a YBA or purchased FTT.
>
> **(5)** **Nationwide Class I:** All persons or entities in the United States who, within the applicable limitations period, purchased or held legal title to any fiat or cryptocurrency deposited or invested through an FTX Platform.
>
> **(6)** **Nationwide Class II:** All persons or entities in the United States who, within the applicable limitations period, purchased or enrolled in a YBA or purchased FTT.

**In the Alternative:**

> **(7)** **Florida Subclass I:** All persons or entities in the State of Florida who, within the applicable limitations period, purchased or held legal title to any fiat or cryptocurrency deposited or invested through an FTX Platform.
>
> **(8)** **Florida Subclass II:** All persons or entities in the state of Florida who, within the applicable limitations period, purchased or enrolled in a YBA or purchased FTT.
>
> **(9)** **Oklahoma Subclass I:** All persons or entities in the state of Oklahoma who, within the applicable limitations period, purchased or held legal title to any fiat or cryptocurrency deposited or invested through an FTX Platform.

**(10)**   **Oklahoma Subclass II:** All persons or entities in the state
of Oklahoma who, within the applicable limitations period,
purchased or enrolled in a YBA or purchased FTT.

Excluded from the Classes are Defendants and their officers, directors, affiliates, legal representatives, and employees, the FTX Group and their officers, directors, affiliates, legal representatives, and employees, any governmental entities, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

294. Plaintiffs reserve the right to modify or amend the definition of the proposed Classes, or to include additional classes or subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses. Plaintiffs seek certification of the Classes in part because all offers of the Deceptive FTX Platform, YBAs and/or FTT to Plaintiffs and the Class Members (in which Defendants each materially assisted, substantially participated, and/or personally participated) were made by FTX from their principal place of business in Miami, Florida, and thus every single offer to sell cryptocurrency, the Deceptive FTX Platform, YBAs and/or FTT stems from a transactional occurrence that emanated from the State of Florida.

**B.**   **Numerosity**

295. The Classes are comprised of thousands, if not millions, of consumers globally, to whom FTX offered and/or sold cryptocurrency, the Deceptive FTX Platform, YBAs and/or FTT. Moreover, thousands, if not millions, of consumers worldwide have executed trades on the FTX Platform within the applicable limitations period. Membership in the Classes are thus so numerous that joinder of all members is impracticable. The precise number of class members is currently unknown to Plaintiffs but is easily identifiable through other means, such as through FTX's corporate records or self-identification.

**C.**   **Commonality/Predominance**

296. This action involves common questions of law and fact, which predominate over any questions affecting individual class members. These common legal and factual questions include, but are not limited to, the following:

(a)  whether Bankman-Fried, the FTX Insiders, and/or FTX committed fraud;

(b)  whether the Defendants agreed with Bankman-Fried, the FTX Insiders, and/or FTX to commit fraud;

(c)  whether the Defendants had the requisite degree of knowledge of Bankman-Fried's, the FTX Insiders', and/or FTX's fraud;

(d)  whether the Deceptive FTX Platform, YBAs and/or FTT were unregistered securities under federal or Florida law;

(e)  whether Defendants' participation and/or actions in FTX's offerings and sales of the Deceptive FTX Platform, YBAs and/or FTT violate the provisions of applicable securities law;

(f)  the type and measure of damages suffered by Plaintiffs and the Class;

(g)  whether Defendants' practices violate the FDUTPA;

(h)  whether Plaintiffs and Class members have sustained monetary loss and the proper measure of that loss;

(i)  whether Plaintiffs and Class members are entitled to injunctive relief;

(j)  whether Plaintiffs and Class members are entitled to declaratory relief; and

(k)  whether Plaintiffs and Class members are entitled to consequential damages, punitive damages, statutory damages, disgorgement, and/or other legal or equitable appropriate remedies as a result of Defendants' conduct.

**D.   Typicality**

297.    Plaintiffs' claims are typical of the claims of the members of the Classes because all members were injured through the uniform misconduct described above, namely that Plaintiffs and all class members were offered and/or sold FTX's Deceptive FTX Platform, YBAs and/or FTT because of Defendants' actions and/or participation in the offering and sale of these unregistered securities, that Defendants aided and abetted the fraud and conversion perpetrated by Bankman-Fried, the FTX Insiders, and/or FTX, or that Defendants agreed with Bankman-Fried, the FTX Insiders, and/or FTX to commit fraud. Plaintiffs are advancing the same claims and legal

1   theories on behalf of themselves and all such members. Further, there are no defenses available to

2   any Defendant that are unique to Plaintiffs.

3   **E.      Adequacy of Representation**

4          298.     Plaintiffs will fairly and adequately protect the interests of the members of the

5   Class. Plaintiffs have retained counsel experienced in complex consumer class action litigation,

6   and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic

7   interests to those of the Classes. Plaintiffs anticipate no difficulty in the management of this

8   litigation as a class action. To prosecute this case, Plaintiffs have chosen the undersigned law firms,

9   which have the financial and legal resources to meet the substantial costs and legal issues

10  associated with this type of consumer class litigation.

11  **F.      Requirements of Fed. R. Civ. P. 23(b)(3)**

12         299.     The questions of law or fact common to Plaintiffs' and each Class member's claims

13  predominate over any questions of law or fact affecting only individual members of the Classes.

14  All claims by Plaintiffs and the unnamed members of the Classes are based on the common course

15  of conduct by Defendants (1) in marketing, offering, and/or selling the Deceptive FTX Platform,

16  YBAs and/or FTT, which are unregistered securities, (2) in receiving secret undisclosed

17  compensation for their promotion of the Deceptive FTX Platform, (3) in aiding and abetting fraud

18  and/or conversion by Bankman-Fried, FTX and the FTX Insiders, and/or (4) in agreeing with

19  Bankman-Fried, the FTX Insiders, and/or FTX to commit fraud.

20         300.     The common course of conduct by Defendants includes, but is not limited to their

21  promotion, offer, sale, solicitation, material assistance, substantial participation in, and/or personal

22  participation in the offer or sale of the Deceptive FTX Platform, YBAs, and/or FTT, and/or their

23  aiding and abetting of the FTX Group's Ponzi scheme, fraud, and/or conversion of billions of

24  dollars of customer assets.

25         301.     Common issues predominate when, as here, liability can be determined on a class-

26  wide basis, even when there will be some individualized damages determinations.

27

28

**CLASS ACTION COMPLAINT**

302.    As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Classes as is in the case at bar, common questions will be held to predominate over individual questions.

**G.    Superiority**

303.    A class action is superior to individual actions for the proposed Classes, in part because of the non-exhaustive factors listed below:

(a) Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside nationwide and throughout the state;

(b) Individual claims by Class members are impracticable because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions;

(c) There are no known individual Class members who are interested in individually controlling the prosecution of separate actions;

(d) The interests of justice will be well served by resolving the common disputes of potential Class members in one forum;

(e) Individual suits would not be cost effective or economically maintainable as individual actions; and

(f) The action is manageable as a class action.

**H.    Requirements of Fed. R. Civ. P. 23(b)(2)**

304.    Defendants have acted and refused to act on grounds generally applicable to the Classes by engaging in a common course of conduct of aiding and abetting the offering and/or selling of  the Deceptive FTX Platform, YBAs and/or FTT, which are unregistered securities, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

305.    Defendants have acted and refused to act on grounds generally applicable to the Classes by engaging in a common course of conduct of uniformly identical and uniform

misrepresentations and omissions in receiving secret undisclosed compensation for their promotion of the Deceptive FTX Platform, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

## I.    Requirements of Fed. R. Civ. P. 23(c)(4)

306.    As it is clear that one of the predominant issues regarding Defendants' liability is whether the Deceptive FTX Platform, YBAs and/or FTT that FTX offered and/or sold are unregistered securities, utilizing Rule 23(c)(4) to certify the Class for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

307.    As it is clear that another predominant issue regarding Defendants' liability is whether they have violated the consumer protection and securities laws of Florida in making identical and uniform misrepresentations and omissions regarding the functionality of the Deceptive FTX Platform, and/or in receiving secret undisclosed compensation for their promotion of the Deceptive FTX Platform, utilizing Rule 23(c)(4) to certify the Classes for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

## J.    Nature of Notice to the Proposed Class.

308.    The names and addresses of all Class Members are contained in the business records maintained by FTX and are readily available to FTX. The Class Members are readily and objectively identifiable. Plaintiffs contemplate that notice will be provided to Class Members by e-mail, mail, and published notice.

**THE GLOBAL OR NATIONWIDE CLAIMS, OR IN THE ALTERNATIVE, THE FLORIDA CLAIMS**

## COUNT ONE

**Violations of the Florida Statute Section 517.07,**
**The Florida Securities and Investor Protection Act**
**(Plaintiffs Individually and on behalf of the Global Classes, or in the alternative, Plaintiffs Garrison, Lindeen, Podalsky, Chernyavsky, and Piano Individually and on behalf of the Nationwide Classes, or in the alternative, Plaintiffs Podalsky, Lindeen, and Chernyavsky on behalf of the Florida Subclasses)**

309.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–307 above, as if fully set forth herein.

310.    Section 517.07(1), Fla. Stat., provides that it is unlawful and a violation for any person to sell or offer to sell a security within the State of Florida unless the security is exempt under Fla. Stat. § 517.051, is sold in a transaction exempt under Fla. Stat. § 517.061, is a federally covered security, or is registered pursuant to Ch. 517, Fla. Stat.

311.    Section 517.211 extends liability to any "director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security."

312.    The Deceptive FTX Platform, YBAs and/or FTT are each a security pursuant to Fla. Stat. § 517.021(22)(a).

313.    The Deceptive FTX Platform, YBAs and/or FTT sold and offered for sale to Plaintiff and Class members were not:

     a.    exempt from registration under Fla. Stat. § 517.051;

     b.    a federal covered security;

     c.    registered with the Office of Financial Regulations (OFR); or

     d.    sold in a transaction exempt under Fla. Stat. § 517.061.

314.   The FTX Group sold and offered to sell the unregistered Deceptive FTX Platform, YBAs and/or FTT to Plaintiffs and the members of the Class.

315.   Defendants are directors, officers, partners and/or agents of the FTX Group pursuant to Fla. Stat. § 517.211.

316.   The FTX Group, with Defendants' material assistance and personal participation, offered and sold the unregistered Deceptive FTX Platform, YBAs and/or FTT to Plaintiffs and the members of the Class. As a result of this assistance, Defendants violated Fla. Stat. § 517.07 et seq. and Plaintiffs and members of the Class sustained damages as herein described.

## COUNT TWO

**For Violations of the Florida Deceptive and Unfair Trade Practices Act,
§ 501.201, Florida Statutes, *et seq.*
(Plaintiffs Individually and on behalf of the Global Classes, or in the alternative, Plaintiffs
Garrison, Lindeen, Podalsky, Chernyavsky, and Piano Individually and on behalf of the
Nationwide Classes, or in the alternative, Plaintiffs Podalsky, Lindeen, and Chernyavsky
on behalf of the Florida Subclasses)**

317.   Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–307 above, as if fully set forth herein.

318.   This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, section 501.201, Fla. Stat., *et seq.* ("FDUTPA"). The stated purpose of the FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2), Fla. Stat.

319.   Plaintiffs and Class members are consumers as defined by section 501.203, Fla. Stat. Defendants are engaged in trade or commerce within the meaning of the FDUTPA.

320.   Florida Statute section 501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

321.   Defendants' unfair and deceptive practices as described herein are objectively likely to mislead – and have misled – consumers acting reasonably in the circumstances.

322.    Defendants have violated the FDUTPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

323.    Plaintiffs and consumers in the Classes have been aggrieved by Defendants' unfair and deceptive practices and acts of false advertising by paying into the Ponzi scheme that was the Deceptive FTX Platform and in the amount of their lost investments.

324.    The harm suffered by Plaintiffs and consumers in the Classes was directly and proximately caused by the deceptive and unfair practices of Defendants, as more fully described herein.

325.    Pursuant to sections 501.211(2) and 501.2105, Fla. Stat., Plaintiffs and consumers in the Classes make claims for actual damages, attorneys' fees and costs.

326.    Defendants still utilize many of the deceptive acts and practices described above. Plaintiffs and the other members of the Classes have suffered and will continue to suffer irreparable harm if Defendants continue to engage in such deceptive, unfair, and unreasonable practices. Section 501.211(1) entitles Plaintiffs and the Classes to obtain both declaratory or injunctive relief to put an end to Defendants' unfair and deceptive scheme.

## **COUNT THREE**

### **Civil Conspiracy**
**(Plaintiffs Individually and on behalf of the Global Classes, or in the alternative, Plaintiffs Garrison, Lindeen, Podalsky, Chernyavsky, and Piano Individually and on behalf of the Nationwide Classes, or in the alternative, Plaintiffs Podalsky, Lindeen, and Chernyavsky on behalf of the Florida Subclasses)**

327.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–307 above, as if fully set forth herein.

328.    The FTX Group and Defendants made numerous misrepresentations and omissions to Plaintiffs and Class Members about the Deceptive FTX Platform in order to induce confidence and to drive consumers to invest in what was ultimately a Ponzi scheme, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the

Deceptive FTX Platform were safe and with material misrepresentations and/or omissions regarding how customer funds would be used. Defendants knew these statements to be false.

329.     The FTX Group entered into one or more agreements with Defendants with the purpose of making these misrepresentations and/or omissions to induce Plaintiff and consumers to invest in the YBAs, FTT and/or use the Deceptive FTX Platform. Defendants each stood to benefit financially from assisting with this fraud as each would receive the financial and other benefits described hereinabove.

330.     Defendants engaged in unlawful acts with the FTX Group, namely, the misrepresentations and omissions made to Plaintiffs and the Classes and the sale of unregistered securities as further described hereinabove.

331.     Defendants' conspiracy substantially assisted or encouraged the wrongdoing conducted by the FTX Group; further, Defendants had knowledge of such fraud and/or wrongdoing, because of their experience and relationship with the FTX Group, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent. Accordingly, each of the Defendants knew that the material misrepresentations and omissions relating to the safety of the Deceptive FTX Platform would result in injury to FTX's customers, including Plaintiffs and the Class members.

332.     Defendants' conspiracy with the FTX Group to commit fraud caused damages to Plaintiffs and the Classes in the amount of their lost investments.

**<u>COUNT FOUR</u>**

**Aiding and Abetting Fraud**
**(Plaintiffs Individually and on behalf of the Global Classes, or in the alternative, Plaintiffs Garrison, Lindeen, Podalsky, Chernyavsky, and Piano Individually and on behalf of the Nationwide Classes, or in the alternative, Plaintiffs Podalsky, Lindeen, and Chernyavsky on behalf of the Florida Subclasses)**

333.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1–307 as if fully set forth herein.

1      334.   The FTX Insiders and FTX Group made numerous misrepresentations and omissions to Plaintiffs and Class Members about the deceptive FTX Platform to induce confidence and to drive consumers to invest in cryptocurrency through the Deceptive FTX Platform, and to deposit funds into what was ultimately a fraudulent house of cards. Defendants misled customers and prospective customers with the false impression that cryptocurrency assets held on the Deceptive FTX Platform were safe and with material omissions regarding how investor funds would be used. Bankman-Fried, the FTX Insiders, and the FTX Group knew these statements to be false.

335.   Plaintiffs and the Class members reasonably relied upon Bankman-Fried, the FTX Insiders, and the FTX Group's material misrepresentations and omissions to invest in cryptocurrency through the Deceptive FTX Platform to their detriment.

336.   Defendants participated in, substantially assisted, and facilitated Bankman-Fried's, the FTX Insiders', and the FTX Group's fraudulent misconduct, with knowledge that such fraud was cheating investors. For example, while either knowing or consciously disregarding Bankman-Fried's and the FTX Group's and Insiders' misconduct and red flags, Defendants still promoted and/or solicited the Deceptive FTX Platform, YBAs, and/or FTT, to Plaintiffs and the Classes as described hereinabove, making the various misrepresentations and omissions as set forth hereinabove.

337.   Defendants substantially benefitted from Bankman-Fried's, the FTX Insiders', and FTX Group's scheme, as described herein.

338.   Plaintiffs and the Class members suffered damages as a direct and proximate result of each of Defendants aiding and abetting the fraudulent scheme, in an amount to be determined at trial.

CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>COUNT FIVE</u>**

**Aiding and Abetting Conversion**
**(Plaintiffs Individually and on behalf of the Global Classes, or in the alternative, Plaintiffs Garrison, Lindeen, Podalsky, Chernyavsky, and Piano Individually and on behalf of the Nationwide Classes, or in the alternative, Plaintiffs Podalsky, Lindeen, and Chernyavsky on behalf of the Florida Subclasses)**

339.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1–307 as if fully set forth herein.

340.    The funds deposited by Class Members into the Deceptive FTX Platform were personal property of the Plaintiffs and Class Members. Bankman-Fried and FTX Group wrongfully interfered with Plaintiffs' possessory interest in a specific, identifiable sum of money. The amount that each plaintiff had in their FTX account that they could not withdraw.

341.    Plaintiffs' funds were their own. They each had a possessory interest in the sum of money they invested in the FTX Platform.

342.    Defendants, based on their knowledge of the FTX Group's operations obtained through due diligence, ongoing monitoring, and partnership, acquired knowledge of FTX's conversion of Plaintiffs' funds.

343.    Notwithstanding this knowledge, and by reason of the conduct described herein, Defendants substantially aided, abetted, and/or participated with FTX in the conversion of funds that belonged to Plaintiffs.

344.    Defendants' actions, in combination with the actions of FTX, are a proximate cause of actual damages to Plaintiffs and class members. Defendants are jointly and severally liable for participating in the conversion of Plaintiffs' funds.

CLASS ACTION COMPLAINT

## COUNT SIX

**Declaratory Judgment**
**(Declaratory Judgment Act, Florida Statutes §§ 86.011 *et seq*.)**
**(Plaintiffs Individually and on behalf of the Global Classes, or in the alternative, Plaintiffs Garrison, Lindeen, Podalsky, Chernyavsky, and Piano Individually and on behalf of the Nationwide Classes, or in the alternative, Plaintiffs Podalsky, Lindeen, and Chernyavsky on behalf of the Florida Subclasses)**

345. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1–307 above as if fully set forth herein.

346. This Count is asserted against Defendants under Florida Statutes §§ 86.011, *et seq*.

347. There is a bona fide, actual, present and practical need for the declaratory relief requested herein; the declaratory relief prayed for herein deal with a present, ascertained or ascertainable state of facts and a present controversy as to a state of facts; contractual and statutory duties and rights that are dependent upon the facts and the law applicable to the facts; the parties have an actual, present, adverse and antagonistic interest in the subject matter; and the antagonistic and adverse interests are all before the Court by proper process for final resolution.

348. Plaintiffs and the members of the Classes have an obvious and significant interest in this lawsuit.

349. Plaintiffs and members of the Classes purchased Deceptive FTX Platform, YBAs and/or FTT, based in part on justifiable reliance on the Defendants' misrepresentations and omissions regarding the Deceptive FTX Platform as further described hereinabove.

350. If the true facts had been known, including but not limited to that the Deceptive FTX Platform, YBAs and/or FTT are unregistered securities, the Deceptive FTX Platform does not work as represented, and Defendants were paid exorbitant sums of money to peddle the Deceptive FTX Platform to the nation, Plaintiffs and the Classes would not have used the Deceptive FTX Platform and/or purchased YBAs and/or FTT in the first place.

351. Thus, there is a justiciable controversy over whether the Deceptive FTX Platform, YBAs and/or FTT were sold illegally, and whether the Defendants illegally solicited their purchases from Plaintiff and the Class.

352.    Plaintiff and the Class seek an order declaring that the Deceptive FTX Platform, YBAs and/or FTT were securities required to be registered with the SEC and state regulatory authorities, that the Deceptive FTX Platform did not work as represented, and Defendants were paid exorbitant sums of money to peddle FTX to the nation.

---

**THE CALIFORNIA CLAIMS, AS AN ALTERNATIVE TO THE NATIONWIDE CLAIMS**

---

## COUNT SEVEN

**For Violations of the Unfair Competition Law Business & Professions Code § 17200, *et seq.*
(In the alternative, Plaintiff Piano Individually and on behalf of the California Subclasses)**

353.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–307 above, as if fully set forth herein.

354.    California's Unfair Competition Law, Business & Professions Code §§ 17200 *et seq.* (the "UCL") prohibits acts of unlawful and unfair competition, including any "unlawful, unfair or fraudulent business act or practice," any "unfair, deceptive, untrue or misleading advertising" and any act prohibited by Business & Profession Code §17500.

355.    Defendants have committed business acts and practices that violate the UCL by aiding and abetting the breaches of fiduciary duties, fraudulent and unfair conduct, and unlawful conduct. Defendants' conduct as alleged above constitutes unlawful competition in that, for the reasons set forth above, said acts and practices violate the Corporations Code.

356.    The conduct of Defendants as alleged above also constitutes unfair competition in that, for the reasons set forth above, the acts and practices offend public policy and are unethical, oppressive, and unscrupulous, and are substantially injurious to the public.

357.    Defendants' conduct was a proximate cause of the injuries to Plaintiffs and the California Class alleged herein, and it caused and continues to cause substantial injury to Plaintiffs and the members of the California Class. By reason of the foregoing, Defendants should be required to pay restitution to Plaintiffs and members of the California Class.

## COUNT EIGHT

**Violations of the California Securities Law**
**Cal. Corp. Code §§ 25110 *et seq.***
**(In the alternative, Plaintiff Piano individually and on behalf of the California Subclasses)**

358.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–307 above, as if fully set forth herein.

359.    Section 25110 of the California Securities Law ("CSL") prohibits the offer or sale by any person in California of securities that are not qualified through registration. CSL section 25503 affords a statutory cause of action to victimized investors for violations of section 25110. Additionally, section 25504.1 extends liability under Section 25503 to any person who materially assists in a violation of section 25110 and makes them jointly and severally liable with any other person liable under section 25503.

360.    Defendants materially assisted and/or personally participated with the FTX Group in the offering and selling of the Deceptive FTX Platform, the YBAs and/or FTT Tokens Securities in California without being properly registered or qualified for offer or sale either with any federal or California regulator in violation of section 25503. [52]

361.    Moreover, CSL section 25210(b) provides: No person shall, … on behalf of an issuer, effect any transaction in, or induce or attempt to induce the purchase or sale of, any security in this state unless [a licensed] broker-dealer and agent have complied with any rules as the commissioner may adopt for the qualification and employment of those agents.

---

[52]    Plaintiffs contend that secondary liability for materially assisting a strict liability violation of the qualification requirements of a violation pursuant to section 255030 does not require proof that Defendants intended "to deceive or defraud." However, Plaintiffs in the alternative contend that even if so, Defendants' knowledge of and participation in FTX Group's non-compliance with the CSL establishes their intent to deceive investors regarding the Deceptive FTX Platform, the YBAs and/or FTT Tokens.

362.     Defendants breached section 25210(b) by encouraging the FTX Group to offer and sell the Deceptive FTX Platform, YBAs and/or FTT Tokens Securities despite the fact that such securities were not qualified under the CSL.

363.     Additionally, CSL section 25501.5 affords a statutory cause of action to victimized investors for violations of Section 25210(b).

364.     Defendants are accordingly joint and severally liable to Plaintiffs for rescissionary damages under section § 25504.1.

365.     Plaintiffs hereby conditionally tender their FTX Group Securities in accordance with section § 25503.

## COUNT NINE

### Aiding and Abetting Fraud
### (In the alternative, Plaintiff Piano Individually and on behalf of the California Subclasses)

366.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1–307 as if fully set forth herein.

367.     The FTX Insiders and FTX Group made numerous misrepresentations and omissions to Plaintiffs and Class Members about the deceptive FTX Platform to induce confidence and to drive consumers to invest in cryptocurrency through the Deceptive FTX Platform, and to deposit funds into what was ultimately a fraudulent house of cards. Defendants misled customers and prospective customers with the false impression that cryptocurrency assets held on the Deceptive FTX Platform were safe and with material omissions regarding how investor funds would be used. Bankman-Fried, the FTX Insiders, and the FTX Group knew these statements to be false.

368.     Plaintiffs and the Class members reasonably relied upon Bankman-Fried, the FTX Insiders, and the FTX Group's material misrepresentations and omissions to invest in cryptocurrency through the Deceptive FTX Platform to their detriment.

369.     Defendants participated in, substantially assisted, and facilitated Bankman-Fried's, the FTX Insiders', and the FTX Group's fraudulent misconduct, with knowledge that such fraud

was cheating investors. For example, while either knowing or consciously disregarding Bankman-Fried's and the FTX Group's and Insiders' misconduct and red flags, Defendants still promoted and/or solicited the Deceptive FTX Platform, YBAs, and/or FTT, to Plaintiffs and the Classes as described hereinabove, making the various misrepresentations and omissions as set forth hereinabove.

370.    Defendants substantially benefitted from Bankman-Fried's, the FTX Insiders', and FTX Group's scheme, as described herein.

371.    Plaintiffs and the Class members suffered damages as a direct and proximate result of each of Defendants aiding and abetting the fraudulent scheme, in an amount to be determined at trial.

## COUNT TEN

### Aiding and Abetting Conversion
### (In the alternative, Plaintiff Piano Individually and on behalf of the California Subclasses)

372.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1–307 as if fully set forth herein.

373.    The funds deposited by Class Members into the Deceptive FTX Platform were personal property of the Plaintiffs and Class Members. Bankman-Fried and FTX Group wrongfully interfered with Plaintiffs' possessory interest in a specific, identifiable sum of money. The amount that each plaintiff had in their FTX account that they could not withdraw.

374.    Plaintiffs' funds were their own. They each had a possessory interest in the sum of money they invested in the FTX Platform.

375.    Defendants, based on their knowledge of the FTX Group's operations obtained through due diligence, ongoing monitoring, and partnership, acquired knowledge of FTX's conversion of Plaintiffs' funds.

376.    Notwithstanding this knowledge, and by reason of the conduct described herein, Defendants substantially aided, abetted, and/or participated with FTX in the conversion of funds that belonged to Plaintiffs.

377.    Defendants' actions, in combination with the actions of FTX, are a proximate cause of actual damages to Plaintiffs and class members. Defendants are jointly and severally liable for participating in the conversion of Plaintiffs' funds.

## COUNT ELEVEN

### Civil Conspiracy
**(In the alternative, Plaintiff Piano Individually and on behalf of the California Subclasses)**

378.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–307 above, as if fully set forth herein.

379.    The FTX Group and Defendants made numerous misrepresentations and omissions to Plaintiffs and Class Members about the Deceptive FTX Platform in order to induce confidence and to drive consumers to invest in what was ultimately a Ponzi scheme, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the Deceptive FTX Platform were safe and with material misrepresentations and/or omissions regarding how customer funds would be used. Defendants knew these statements to be false.

380.    The FTX Group entered into one or more agreements with Defendants with the purpose of making these misrepresentations and/or omissions to induce Plaintiff and consumers to invest in the YBAs, FTT and/or use the Deceptive FTX Platform. Defendants each stood to benefit financially from assisting with this fraud as each would receive the financial and other benefits described hereinabove.

381.    Defendants engaged in unlawful acts with the FTX Group, namely, the misrepresentations and omissions made to Plaintiffs and the Classes and the sale of unregistered securities as further described hereinabove.

382.    Defendants' conspiracy substantially assisted or encouraged the wrongdoing conducted by the FTX Group; further, Defendants had knowledge of such fraud and/or wrongdoing, because of their experience and relationship with the FTX Group, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent. Accordingly, each of the Defendants knew that the material misrepresentations and omissions

1  relating to the safety of the Deceptive FTX Platform would result in injury to FTX's customers,

2  including Plaintiffs and the Class members.

3        383.    Defendants' conspiracy with the FTX Group to commit fraud caused damages to

4  Plaintiffs and the Classes in the amount of their lost investments.

5

6  **IN THE ALTERNATIVE, THE OKLAHOMA CLAIMS**

7  **COUNT TWELVE**

8  **Violations of the Oklahoma Consumer Protection Act**
   **Okla. Stat. Ann. tit. 15, § 751 *et seq*.**

9  **(In the alternative, Plaintiff Garrison individually and on behalf of the Oklahoma**

10  **Subclasses)**

11

12        384.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–307 above,

13  as if fully set forth herein.

14        385.    This cause of action is brought pursuant to the Oklahoma Consumer Protection Act

15  ("OCPA") section 751 *et seq*.

16        386.    The Oklahoma Consumer Protection Act provides that an "unfair trade practice" is

17  "any practice which offends established public policy or if the practice is immoral, unethical,

18  oppressive, unscrupulous or substantially injurious to consumers." § 752(14). It declares unlawful

19  any unfair or deceptive trade practice "as defined in section 752." § 753(20).

20        387.    Plaintiffs and Class members are persons as defined by section 752(1). Defendants

21  are engaged in a "consumer transaction" as defined by section 752(2), and as described more fully

22  herein.

23        388.    Defendants have violated the OCPA by engaging in the unfair and deceptive

24  practices as described herein, which offend public policies and are immoral, unethical,

25  unscrupulous and injurious to consumers.

26        389.    Plaintiffs and consumers in the Class have been aggrieved by Defendants' unfair

27  and deceptive practices in the amount of their lost investments.

28

CLASS ACTION COMPLAINT

390.    The harm suffered by Plaintiffs and consumers in the Class was directly and proximately caused by the deceptive and unfair practices of Defendants', as more fully described herein.

391.    Pursuant to section 761.1 of the OCPA, Plaintiffs and consumers in the Class make claims for actual damages, attorneys' fees and costs.

## COUNT THIRTEEN

### Violations of the Oklahoma Uniform Securities Act of 1980
### Okla. Stat. Tit. 71, §§ 1-101 *et seq.*
### (In the alternative, Plaintiff Garrison individually and on behalf of the Oklahoma Subclasses)

392.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–307 above, as if fully set forth herein.

393.    71 Section 1-301 of the Oklahoma Securities Act ("OSA") makes it unlawful to sell a security in Oklahoma unless the security is registered, exempted, or the security is a covered security as defined in the act.

394.    The Deceptive FTX Platform, YBAs and/or FTT Tokens are each a security pursuant to 71 Okla. Stat. § 1-102(32), as described more fully herein.

395.    As a result of these actions, Defendants violated section 1-102(32) and are liable to Plaintiffs pursuant to section 1-509 for both primary and secondary violations of Oklahoma securities law, as described more fully hereinabove.

## COUNT FOURTEEN

### Aiding and Abetting Fraud
### (In the alternative, Plaintiff Garrison individually and on behalf of the Oklahoma Subclasses)

396.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1–307 as if fully set forth herein.

397.    The FTX Insiders and FTX Group made numerous misrepresentations and omissions to Plaintiffs and Class Members about the deceptive FTX Platform to induce confidence and to drive consumers to invest in cryptocurrency through the Deceptive FTX Platform, and to

deposit funds into what was ultimately a fraudulent house of cards. Defendants misled customers and prospective customers with the false impression that cryptocurrency assets held on the Deceptive FTX Platform were safe and with material omissions regarding how investor funds would be used. Bankman-Fried, the FTX Insiders, and the FTX Group knew these statements to be false.

398.    Plaintiffs and the Class members reasonably relied upon Bankman-Fried, the FTX Insiders, and the FTX Group's material misrepresentations and omissions to invest in cryptocurrency through the Deceptive FTX Platform to their detriment.

399.    Defendants participated in, substantially assisted, and facilitated Bankman-Fried's, the FTX Insiders', and the FTX Group's fraudulent misconduct, with knowledge that such fraud was cheating investors. For example, while either knowing or consciously disregarding Bankman-Fried's and the FTX Group's and Insiders' misconduct and red flags, Defendants still promoted and/or solicited the Deceptive FTX Platform, YBAs, and/or FTT, to Plaintiffs and the Classes as described hereinabove, making the various misrepresentations and omissions as set forth hereinabove.

400.    Defendants substantially benefitted from Bankman-Fried's, the FTX Insiders', and FTX Group's scheme, as described herein.

401.    Plaintiffs and the Class members suffered damages as a direct and proximate result of each of Defendants aiding and abetting the fraudulent scheme, in an amount to be determined at trial.

## COUNT FIFTEEN

**Aiding and Abetting Conversion**
**(In the alternative, Plaintiff Garrison individually and on behalf of the Oklahoma Subclasses)**

402.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1–307 as if fully set forth herein.

403.    The funds deposited by Class Members into the Deceptive FTX Platform were personal property of the Plaintiffs and Class Members. Bankman-Fried and FTX Group wrongfully

interfered with Plaintiffs' possessory interest in a specific, identifiable sum of money. The amount that each plaintiff had in their FTX account that they could not withdraw.

404.    Plaintiffs' funds were their own. They each had a possessory interest in the sum of money they invested in the FTX Platform.

405.    Defendants, based on their knowledge of the FTX Group's operations obtained through due diligence, ongoing monitoring, and partnership, acquired knowledge of FTX's conversion of Plaintiffs' funds.

406.    Notwithstanding this knowledge, and by reason of the conduct described herein, Defendants substantially aided, abetted, and/or participated with FTX in the conversion of funds that belonged to Plaintiffs.

407.    Defendants' actions, in combination with the actions of FTX, are a proximate cause of actual damages to Plaintiffs and class members. Defendants are jointly and severally liable for participating in the conversion of Plaintiffs' funds.

## COUNT SIXTEEN

### Civil Conspiracy
### (In the alternative, Plaintiff Garrison Individually and on behalf of the Oklahoma Subclasses)

408.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–307 above, as if fully set forth herein.

409.    The FTX Group and Defendants made numerous misrepresentations and omissions to Plaintiffs and Class Members about the Deceptive FTX Platform in order to induce confidence and to drive consumers to invest in what was ultimately a Ponzi scheme, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the Deceptive FTX Platform were safe and with material misrepresentations and/or omissions regarding how customer funds would be used. Defendants knew these statements to be false.

410.    The FTX Group entered into one or more agreements with Defendants with the purpose of making these misrepresentations and/or omissions to induce Plaintiff and consumers to

invest in the YBAs, FTT and/or use the Deceptive FTX Platform. Defendants each stood to benefit financially from assisting with this fraud as each would receive the financial and other benefits described hereinabove.

411. Defendants engaged in unlawful acts with the FTX Group, namely, the misrepresentations and omissions made to Plaintiffs and the Classes and the sale of unregistered securities as further described hereinabove.

412. Defendants' conspiracy substantially assisted or encouraged the wrongdoing conducted by the FTX Group; further, Defendants had knowledge of such fraud and/or wrongdoing, because of their experience and relationship with the FTX Group, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent. Accordingly, each of the Defendants knew that the material misrepresentations and omissions relating to the safety of the Deceptive FTX Platform would result in injury to FTX's customers, including Plaintiffs and the Class members.

413. Defendants' conspiracy with the FTX Group to commit fraud caused damages to Plaintiffs and the Classes in the amount of their lost investments.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray for a judgment on behalf of themselves and the Classes:

a.  Certifying the Class as requested herein;

b.  Awarding actual, direct and compensatory damages;

c.  Awarding restitution and disgorgement of revenues if warranted;

d.  Awarding declaratory relief as permitted by law or equity, including declaring the Defendants' practices as set forth herein to be unlawful;

e.  Awarding injunctive relief as permitted by law or equity, including enjoining the Defendants from continuing those unlawful practices as set forth herein, and directing the Defendants to identify, with Court supervision, victims of their conduct and pay them all money they are required to pay;

f.  Awarding statutory and multiple damages, as appropriate;

1    g.    Awarding attorneys' fees and costs; and

2    h.    Providing such further relief as may be just and proper.

3    ## DEMAND FOR JURY TRIAL

4    Plaintiffs hereby demand a jury trial as to all claims so triable.

5

6    Dated:  July 21, 2023

7                                   By: */s/ Mark C. Mao*
8                                       Mark C. Mao

9                                   **BOIES SCHILLER FLEXNER LLP**
10                                  Brooke Alexander (pro hac vice pending)
                                    balexander@bsfllp.com
11                                  333 Main Street
                                    Armonk, NY 10504
12                                  Telephone:  (914) 749-8200
                                    Facsimile:   (914) 749-8300
13
14                                  **BOIES SCHILLER FLEXNER LLP**
                                    Mark C. Mao (SBN 236165)
15                                  mmao@bsfllp.com
                                    44 Montgomery Street, 41st Floor
16                                  San Francisco, CA 94104
                                    Telephone:  (415) 293-6800
17                                  Facsimile:   (415) 293-6899

18                                  Attorneys for Plaintiffs,
19                                  Edwin Garrison, Gregg Podalsky,
                                    Skyler Lindeen, Alexander Chernyavsky,
20                                  Gary Piano, Sunil Kavuri, Gary Gallant
                                    and David Nicol
21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT